Barbara **HANDSCHU, Ralph Digia, Alex McKeiver, Shaba Om, Curtis M. Powell, Abbie Hoffman, Mark A. Segal, Michael Zumoff, Kenneth Thomas, Robert Rusch, Anette T. Rubenstein, Michey Sheridan, Joe Sucher, Steven Fischler, Howard Blatt and Ellie Benzone, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**SPECIAL SERVICES DIVISION, a/k/a Bureau of Special Services, William H.T. Smith, Arthur Grubert, Michael Willis, William Knapp, Patrick Murphy, Police Department of the City of New York, John V. Lindsay and various unknown employees of the Police Department acting as under-cover operators and informers, Defendants.**

No. 71 CIV. 2203(CSH).

United States District Court, S.D. New York.

Feb. 11, 2003.

---

Paul G. Chevigny, Jethro M. Eisenstein, Profeta & Eisenstein, Martin R. Stolar, Franklin Siegel, Attorneys for plaintiff class, Arthur Eisenberg, New York Civil Liberties Union, appearing with attorneys for plaintiff class, New York City, for Plaintiffs.

Gail Donoghue, Special Assistant Corporation Counsel, New York City, for Defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge.

Defendants, successor officials in charge of the New York City Police Department (collectively "the NYPD"), represented by the Corporation Counsel of the City of New York ("Corporation Counsel"), move pursuant to Rule 60(b), Fed.R.Civ.P., for an order modifying the presently existing "Handschu Guidelines" which govern the NYPD's activities in the investigation of political activity. The Guidelines' popular name is derived from the first-named plaintiff in this civil rights class action commenced in 1971 under 28 U.S.C. § 1783 for a declaratory judgment and injunctive relief on a claim that various surveillance and other activities of the NYPD violated class members' rights guaranteed by the United States Constitution.

Following discovery and this Court's certification of the class, the parties proposed a settlement which the Court approved in an order dated March 7, 1985, subsequently affirmed by the Court of Appeals. The Handschu Guidelines were an integral part of that settlement and have governed the NYPD's investigative conduct in the indicated area since that date.

The NYPD suggests specific Guidelines modifications and asks the Court to approve them. Class counsel resist these proposed modifications.

## I. BACKGROUND

For purposes of evaluating the NYPD's present motion, the most important prior opinions in the case are those of this Court denying defendants' motion to dismiss the complaint, *Handschu v. Special Services Division, et al.*, 349 F.Supp. 766 (S.D.N.Y. 1972) ("*Handschu I*") and thereafter approving the settlement of the class action, 605 F.Supp. 1384 (S.D.N.Y.1985) ("*Handschu II*"), and the Second Circuit's opinion affirming that approval, 787 F.2d 828 (2d Cir.1986) ("*Handschu III*"). Familiarity with those opinions, which fully describe the underlying facts, is assumed. I reiterate the factual background to the extent necessary for comprehension of the NYPD's motion to modify the Handschu Guidelines, class counsel's objections to that motion, and the Court's resolution of it.

### A. The Complaint

In *Handschu I*, Judge Weinfeld's opinion denying the defendants' motion to dismiss the complaint summarized its allegations:

The complaint alleges that certain practices and conduct of SIS [the then-existing designation of the NYPD intelligence unit] infringe plaintiffs' constitutional rights and these are set forth under seven specific categories: (1) informers; (2) infiltration; (3) interrogation; (4) overt surveillance; (5) summary punishment; (6) intelligence gathering; (7) electronic surveillance. In end result it is charged that these factors have a "chilling effect" on plaintiffs and members of their class in the exercise of their constitutional

rights of freedom of speech, assembly and association; that they violate their rights against unlawful search and seizure because the SIS proceeds without obtaining warrants or judicial authorization; also that they violate their rights of privacy and to substantive and procedural due process; and finally, that the effect of such activities is to visit upon them cruel and unusual punishment. Thus, the broad sweep of plaintiffs' complaint charges violations of the First, Fourth, Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution.

349 F.Supp. at 768–69.[1] Judge Weinfeld denied the defendants' motion to dismiss the complaint because "[a]t this pleading stage it cannot be said that it appears to a certainty that the plaintiffs would be entitled to no relief under any state of facts which could be proved in support of their claim," leaving it to plaintiffs to prove the claim if they could. *Id.* at 771 (citations and internal quotation marks omitted).

The genesis of the NYPD activities of which plaintiffs complained was described in the affidavit of then Police Commissioner Patrick V. Murphy, submitted in support of defendants' unsuccessful motion before Judge Weinfeld to dismiss the complaint, which I quoted or paraphrased in *Handschu II*. Referring to several NYPD intelligence units by the names they bore at the time, "Commissioner Murphy traced the origin of the SSD (predecessor unit of the PSS) back to an 'Italian Squad' formed in 1904 to curtail the illegal activities of a group of Italian immigrants called the 'Black Hand Society.'" 605 F.Supp. at 1396. Murphy acknowledged that "[p]olitical unrest in the 1960's, including protests over the Indo–China war, prompted an increase of SSD investigations," which included undercover and other surveillance

of "groups that because of their conduct or rhetoric may pose a threat to life, property, or governmental administration." *Id. See also* my own observation that "[t]he decades of the sixties and seventies were periods of heightened American public awareness of political unrest and law enforcement response." *Id.* at 1398. During those more recent times the NYPD gathered intelligence, according to Murphy, "by means of infiltrations and informers, and telephone wiretapping, electronic eavesdropping, covert photography of individuals attending demonstrations, and recording speeches at demonstrations"; moreover, this intelligence gathering "was not limited to investigations of crime, but related to any activity likely to result in a serious police problem.'" *Id.* at 1396. These candid acknowledgments led me to conclude in *Handschu II* that "class counsel are correct in saying that Commissioner Murphy conceded that the Police Department was engaged in the vast bulk of activities described in the complaint, including surreptitious surveillance and undercover infiltration of the political activities of individuals and groups." *Id.*

## B. Certification of the Class

Following discovery, this Court certified a plaintiffs' class pursuant to Rules 23(a), (b)(1)(A) and (b)(2), Fed.R.Civ.P. The class was defined in an unreported opinion and order dated May 24, 1979, quoted in *Handschu II*, 605 F.Supp. at 1388, as follows:

All individuals resident in the City of New York, and all other persons who are physically present in the City of New York, and all organizations located or operating in the City of New York, who engage in or have engaged in lawful political, religious, educational or social activities and who, as a result of those

---

**1.** The case was originally assigned to Judge Weinfeld, and subsequently reassigned to me.

activities, have been, are now or hereafter may be subjected to or threatened by infiltration, physical and verbal coercion, photographic, electronic and physical surveillance, provocation of violence, recruitment to act as police informers and dossier collection and dissemination by defendants and their agents.

## C. The Settlement Agreement and the Handschu Guidelines

In 1985, before this Court had adjudicated plaintiffs' claims for a declaratory judgment and injunctive relief, class counsel and the Corporation Counsel negotiated a settlement which they presented to the Court for approval, as required by the rules governing class actions. My opinion in *Handschu II* rejected the contentions of objectors to the settlement and approved it, a decision affirmed by the Court of Appeals in *Handschu III*.

As the Second Circuit noted in *Handschu III*, the agreement "is in two parts, the first being a stipulation of settlement which provides for discontinuance of the class action with prejudice upon defendants' adoption of specified Guidelines, and the second being the Guidelines themselves." 787 F.2d at 831. This Court placed upon the stipulation of settlement and the accompanying Guidelines the imprimatur of its own order, thereby investing them with the procedural and substantive trappings of a consent decree. Because the NYPD by this motion seeks to modify the Guidelines, I focus upon them.

The full text of the Handschu Guidelines appears in *Handschu II*, 605 F.Supp. at 1420–24, and is incorporated herein by reference. For present purposes, it is sufficient to quote some provisions and summarize others.

The introductory "General Statement of Policy" provides: "Activities of the Public Security Section (hereafter PSS) of the Intelligence Division will conform to constitutionally guaranteed rights and privileges. Information shall be collected, retained and disseminated by the PSS only in accordance with the provisions set forth herein."

Section II.A. defines "political activity" as: "The exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions." Section II.B. defines the "Authority" as "a board established pursuant to Section III of these Guidelines." Section II.C. defines "investigation" as: "A police activity undertaken to obtain information or evidence." "Undercover" is defined by Section II.D. as an NYPD employee or agent "who joins in a political organization for the purpose of investigation without disclosing police affiliation." Section II.E. defines "investigator" as an NYPD employee "who attends public functions of a political organization for the purpose of gathering information on political activity without disclosing police affiliation."

Section III established an "Authority" (popularly referred to as the "Handschu Authority"), consisting of two high-ranking NYPD officers and a civilian member appointed by the Mayor, "to oversee the activities" of the NYPD intelligence unit. Section IV provides for the "Conduct of Investigations and Role of Authority." On this motion to modify the Guidelines, the NYPD places particular stress upon the provisions in Section IV.A. that it "shall not engage in any investigation of political activity" except through the designated intelligence unit and that "such investigations shall be conducted as set forth in these guidelines"; and the provision in Section IV.C. that:

> When specific information has been received by the Police Department that a person or group engaged in political

activity is engaged in, about to engage in or has threatened to engage in conduct which constitutes a crime the [intelligence unit] is authorized to commence an investigation of such person or group subject to the following limitations:

The detailed limitations contained in Section IV.C. provide that the NYPD cannot initiate an investigation of "a person or group engaged in political activity" unless it first submits to the Authority "an Investigation Statement which specifies the factual predicate therefor." Section IV.C.1. The investigation may proceed without Authority approval for thirty days after such a statement has been filed. After thirty days, the NYPD must obtain written Authority approval to continue the investigation; the Authority may approve continuation of the investigation for sixty days or disapprove it. Authority approval also is required for the use of undercover agents for intelligence gathering.

Section V, captioned "Review of Records to Determine Compliance," provides that "[a]t any time, a person or a member of a group or organization having reason to believe that such person has been named in the PSS files as a result of an investigation into his, her or its political activities, may request in writing which sufficiently identifies the requesting party that the Authority make an inquiry of the PSS." The Authority is obligated to conduct an inquiry to determine whether this is so, and, if it is, to determine whether the pertinent investigation was conducted in accordance with the Guidelines, thereafter reporting instances of nonconforming investigations to the Police Commissioner, for the initiation of appropriate disciplinary measures. The Authority notifies the inquiring individual or group of any noncompliance; that individual or group may request to inspect the improperly acquired material; and the Authority decides whether the material is destroyed or retained.

Section VI.A. provides that "information concerning individuals, groups or organizations shall be collected, maintained and indexed only when collected pursuant to these Guidelines," *i.e.*, collected during a Handschu Authority-approved investigation following satisfaction of the criminal activity requirement. Section VI.A. further provides that the NYPD may not include in its intelligence files information from publicly available sources. Section VI.B. provides that the NYPD may not, without the written authorization of the Authority, include information that an individual has signed a political petition; or the individual's name appears on a mailing list; or the individual has monetarily supported "a political or religious group or its aims" or "authored a published writing expounding a particular political or religious view." Moreover, an "individual's or organization's political, religious, sexual or economic preference" may not be "the sole basis" upon which the NYPD develops a file on that individual or organization.

Section VII, captioned "Dissemination of Records," specifies how intelligence information gathered by the NYPD may be shared with others. Requests for information must be screened, and release of information is limited to law enforcement agencies and government security clearance investigations. The cover letter to any agency receiving such information must be stamped in capital letters with notice of the Handschu Guidelines and the warning: "A FEDERAL COURT ORDER REQUIRES THAT [THIS INFORMATION] NOT BE DISCLOSED TO ANY PERSON . OR ORGANIZATION WITHOUT THE EXPRESS AUTHORIZATION OF THE NEW YORK CITY POLICE DEPARTMENT."

Section VIII requires the commander of the NYPD intelligence unit to review every 12 months the unit's files and submit a

written report of that review to the Authority, for the purpose of determining "to the fullest extent possible that no files are being kept which violate the Guidelines."

Section IX requires the Authority to submit a report each calendar year of its activities "to the Police Commissioner for submission to the Mayor."

### D. The NYPD's Motion to Modify the Handschu Guidelines

The modified Handschu Guidelines proposed by the NYPD appear as Appendix A to this Opinion. I will discuss them in detail *infra*, but note preliminarily that following the dreadful events of 9/11, it occurred to class counsel that the unprecedented emergence of terrorism and its attendant dangers might require reconsideration of the Handschu Guidelines. We know this because Mr. Eisenstein, one of the plaintiff class's able attorneys, disclosed it at the January 29, 2003 oral argument on the NYPD's motion. He said:

> In fact, I wrote to the Corporation Counsel months before this motion was made on behalf of all of us. It was a collective decision. I wrote and said, terrible things have happened, we believe that Handschu continues to be an important protection of civil liberties, we stand ready to discuss with you the continued viability of the Handschu agreement. The response that I got was, we're considering the matter and we'll get back to you. And we ended up getting this motion.

Tr. 39. The sensitive mind might interpret that response, reminiscent of a famous front-page headline of yesteryear, as "City to Class: Drop Dead." [2] Time and

effort might have been saved if the Corporation Counsel, instructed by its client the NYPD, had entered into the sort of dialogue class counsel suggested; after all, the present Handschu Guidelines came into being as the result of negotiations and compromise. However, the reality is that no dialogue occurred, instead the NYPD made a motion to modify the Guidelines, class counsel oppose the modifications, and the matter is before the Court for decision.

The asserted factual basis for the NYPD's motion is found in the testimony of David Cohen, the NYPD's Deputy Commissioner for Intelligence, given in the form of three declarations under penalty of perjury pursuant to 28 U.S.C. § 1746 and dated September 12, 2002 ("Cohen 1"), November 26, 2002 ("Cohen 2"), and January 24, 2003 ("Cohen 3"). I will consider Deputy Commissioner Cohen's testimony in detail in the discussion under Part II. For background purposes it is sufficient to say that in Cohen 1, the Deputy Commissioner begins by expressing the opinion that "[t]he continued enforcement of the Guidelines is no longer consistent with the public interest because they limit the effective investigation of terrorism and prevent cooperation with federal and state law enforcement agencies in the development of intelligence." ¶ 1. Cohen then identifies and discusses three manners in which the Handschu Guidelines "obstruct the development of intelligence": the "criminal activity requirement" found in Section IV.C. of the Guidelines, quoted *supra* in Part I.C. of this opinion, *see* Cohen 1 at ¶¶ 48–56; "collection and retention of information," *id.* at ¶¶ 57–66; and "dissemination of information," *id.* at

---

**2.** The earlier headline read "Ford to City: Drop Dead," a memorable example of the gritty, street-wise prose that characterizes some (not all) New York newspapers. Of course, the analogy is far from perfect; that headline was prompted by President Ford's

refusal to make federal funds available to assist New York's fiscal crisis, while, as discussed in text, the NYPD's modified Handschu Guidelines continue to acknowledge the paramount importance of the Constitution.

¶¶ 67–80. In addition to those three areas, Deputy Commissioner Cohen expresses his concern that "the Guidelines impact on the daily operational decisions of commanding officers," since they "restrict intelligence investigations of political activity to personnel assigned to a single unit within the Intelligence Division, the Public Security Section," an operational handicap because "the entire resources of the NYPD must be available to conduct investigations into political activity and intelligence related issues." *Id.* at ¶ 81.

I turn now to the nature and effect of the modifications to the Handschu Guidelines proposed by the NYPD, referring for the sake of convenience to the two sets of guidelines as "Present Handschu" and "Modified Handschu."

Modified Handschu's introductory "General Statement of Policy" reads in its entirety: "Activities of the New York City Police Department in the investigation of political activity will conform to constitutionally guaranteed rights and privileges." That is a repetition of the substance of the first sentence of Present Handschu's policy statement, the only change being a reference to the entire NYPD rather than to the particular Intelligence Division section identified in Present Handschu. Modified Handschu deletes the second sentence of Present Handschu's policy statement, which requires NYPD intelligence activities to be conducted in accordance with the Guidelines.

Section II of Modified Handschu repeats the definitions of "political activity," "Authority," and "investigation" that appear in Section II of Present Handschu. The definitions in Present Handschu of "undercover," Section II.D., and "investigator," Section II.E., are deleted by Modified Handschu.

Section III of Modified Handschu establishes "an Authority" consisting of three members, two high-ranking police officers and a civilian member appointed by the Mayor. In those respects Modified Handschu tracks Present Handschu. However, Section III of Modified Handschu provides that the Authority is established "to conduct the review of records described in paragraph V."[3] Moreover, Modified Handschu deletes Section IV of Present Handschu and all of that Section's detailed provisions with respect to the conduct of investigations and the Handschu Authority's oversight responsibilities in that regard. Accordingly, under Modified Handschu the Authority's *sole* function is to conduct the review of records described in Section V of Modified Handschu.

Section V of Modified Handschu, captioned as was Section V of Present Handschu "Review of Records to Determine Compliance," follows the model of Present Handschu Section V by allowing persons or members of a group or organization to request the Handschu Authority to initiate an inquiry in certain circumstances. But the circumstances are different. As noted *supra*, Present Handschu provides that a person or member of a group or organization "having reason to believe that such person, group or organization has been named in PSS files as a result of an investigation in connection with or related to his, her or its political activities" may request in writing "that the Authority make an inquiry of the PSS." The Authority's responsibilities are, *inter alia*, to ask the PSS "if it maintains a file including the name of such person or group," and if it does, to determine whether or not "an investigation was conducted in accordance with these Guidelines," the Authority's subsequent actions being dependent on the answer to that question; in either event, the requesting party is notified of the Au-

---

3. For consistency of format, "paragraph V" should read "Section V."

thority's conclusion. Section V of Modified Handschu provides that a person or member of a group or organization "having reason to believe that such person, group or organization has been the subject of investigation of political activity which violates constitutionally guaranteed rights and privileges" may request in writing "that the Authority make inquiry of the appropriate investigative officer of the NYPD." The Authority's responsibilities are, *inter alia,* to determine whether the investigation was or was not "conducted in accordance with the Constitution," and notify the requesting party of the Authority's conclusion. Thus Section V.B.3. of Modified Handschu provides: "In the event the inquiry determines that such investigation with respect to the requesting party, was not conducted in accordance with the Constitution, the Authority shall so notify the requesting party and submit a report to the Police Commissioner."

Modified Handschu deletes Sections VI, VII, VIII, and IX of Present Handschu.

### E. The 2002 FBI Guidelines

For reasons that will appear, this background description must include reference to The Attorney General's Guidelines on General Crimes, Racketeering Enterprise and Terrorism Enterprise Investigations (the "FBI Guidelines") issued post–9/11 by Attorney General Ashcroft on May 30, 2002.

The NYPD included a copy of the FBI Guidelines in a submission on the present motion. It did so in order to illustrate a suitable form of tailoring the Handschu Guidelines to meet changed circumstances, thereby satisfying a requirement articulated by the Supreme Court in *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), discussed in Part II.B., C., and D., *infra.* In his first declaration, Deputy Commissioner Cohen characterized the 2002 FBI

Guidelines as "modifications of the FBI Guidelines to allow unhampered intelligence investigation within constitutional bounds." Cohen 1 at ¶ 15. That is also the stated purpose of the Modified Handschu Guidelines; but the FBI Guidelines comprise 24 single-spaced typed pages, whereas the Modified Handschu Guidelines comprise just over two double-spaced typed pages, the most prominent word being "DELETED." This prompted the questions of "(1) whether the FBI Guidelines restrict FBI investigations in ways that the Modified Handschu Guidelines would not restrict NYPD investigations; and (2) if so, whether differences in the circumstances confronting the FBI and the NYPD in investigating terrorism explain the differences in the restrictions." I have quoted from an opinion reported at 2003 WL 151974 (S.D.N.Y. Jan. 22, 2003), at *1, directing counsel to address certain questions at the January 29 oral argument on the NYPD's motion.

Counsel complied with those directions. But an additional development occurred with respect to the FBI Guidelines. In his third declaration, Deputy Commissioner Cohen says this:

I have carefully reviewed the Attorney General's Guidelines. They provide the FBI with full investigative powers and permit the FBI to investigate a complete range of terrorism activity from preparatory conduct to the operation of an organized enterprise. In my view, the NYPD would be able to investigate terrorism under the Attorney General's Guidelines.

In the event this Court were to grant defendants' application, the NYPD will, in accordance with its practice, adopt internal guidelines for the investigation of political activity to be included in the patrol guide. These guidelines will incorporate, in substance, the authorizations and limitations, such as they are, contained in the Attorney General's

Guidelines. Consistent with the internal organizational structure of the Intelligence Division, the NYPD guidelines will provide for a system of approvals and review for various aspects of an investigation, particularly with respect to intrusive investigative techniques such as the use of undercovers, confidential informants and electronic surveillance.

Cohen 3 at ¶¶ 3, 4.

Class counsel contended at oral argument that this undertaking "is entitled to no consideration on this motion," Tr. 39, to which Corporation Counsel (Ms. Donoghue) responded: "I would like to say that plaintiffs' counsel suggesting that Commissioner Cohen's promise is not to be trusted is offensive. The promise was made in a sworn declaration, and I have represented to the Court, today, in this courtroom, that is a promise. And I think the Court should rely on that." Tr. 52.

If class counsel's argument was intended as the functional equivalent of a motion to strike the quoted paragraphs of the third Cohen declaration, I would deny it. I think it is both fair and necessary to consider Deputy Commissioner Cohen's undertaking with respect to the FBI Guidelines and the NYPD patrol guide for what relevance it may have in evaluating the merits of the NYPD's motion to modify the Handschu Guidelines, an evaluation to which I now turn.

## II. DISCUSSION

### A. Standard of Review

■ The NYPD asks this Court to modify a settlement agreement and investigative guidelines contained within a consent decree. The modification of a consent de-

cree rests within the discretion of the trial court. *See United States v. Secretary of Housing and Urban Development*, 239 F.3d 211, 216 (2d Cir.2001) ("[B]ecause consent decrees are injunctions, their modifications are reviewed for abuse of discretion only.").

### B. The Governing Law

■ The trial court's exercise of discretion in modifying a consent decree must be informed by the governing law, lest that exercise be an abuse of discretion.

In the case at bar, there are two sources of governing law: Rule 60(b), Fed.R.Civ. P., which the NYPD invokes to modify the Handschu Guidelines; and *Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), the Supreme Court decision articulating what a party seeking to "modify consent decrees stemming from institutional reform litigation" must establish in order to succeed. *Id.* at 764–65.[4]

■ Rule 60(b) provides in relevant part:

On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment.

The NYPD, seeking modification of the Handschu Guidelines because of recent

---

**4.** The institution plaintiffs in *Rufo* sought to reform was a county jail in Massachusetts. The institution plaintiffs at bar sought to reform was the NYPD. The consent decrees in *Rufo* and the case at bar may both be charac-

terized as "consent decrees stemming from institutional reform litigation," as the Court used that phrase in *Rufo*. In any event, both parties agree that the *Rufo* requirements govern this case.

acts and the attendant expanded and unprecedented perils of terrorism, relies principally upon the provision in Rule 60(b)(5) that "it is no longer equitable that the judgment should have prospective application." In determining what is "equitable," this Court sits as a chancellor in equity; that is the source of its discretionary powers. *Rufo* instructs what the NYPD must show to obtain the requested equitable relief:

> Under the flexible standard we adopt today, a party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance.

502 U.S. at 393, 112 S.Ct. 748.

Because "institutional reform litigation" invariably involves the conduct and decisions of local government, the question arises as to the amount of deference a federal district court properly owes to the views of local government officials on a motion to modify a consent decree to which local government is a party. *Rufo* addresses that question head-on, in the context of the two-pronged showing that case requires:

> [T]he moving party bears the burden of establishing that a significant change in circumstances warrants modification of a consent decree. No deference is involved in this threshold inquiry. However, once a court has determined that a modification is required, we think that principles of federalism and simple common sense require the court to give significant weight to the views of the local government officials who must implement any modification.

502 U.S. at 392 n. 14, 112 S.Ct. 748.

## C. Changed Circumstances: the First *Rufo* Prong

 A party seeking to modify a consent decree must make the threshold showing that "a significant change in facts or law" warrants revision of the decree. *Rufo*, 502 U.S. at 393, 112 S.Ct. 748 (emphasis added). In the case at bar, the NYPD does not argue that a change in law mandates modification of the Handschu Guidelines. Rather, as noted in Part I.D., the NYPD perceives in the events of 9/11 and subsequent revelations about international terrorism a significant change in facts mandating modification of the Guidelines because in their present form "they limit the effective investigation of terrorism and prevent cooperation with federal and state law enforcement agencies in the development of intelligence." Cohen 1 at ¶ 1.

There is no disputing Deputy Commissioner Cohen's assertion that since the formulation of the Handschu Guidelines in 1985, "[t]he world has undergone remarkable changes, ... not only in terms of new threats we face but also in the ways we communicate and the technology we now use, and are used by those who seek to harm us." Cohen 1 at ¶ 7. Cohen speaks with the experience attained during his 35 years of service with the CIA, during which he was Deputy Director for Operations and previously Deputy Director of the of the CIA's Directorate of Intelligence. *Id.* at ¶¶ 3–5. The NYPD appointed Cohen Deputy Commissioner for Intelligence in February 2002. *Id.* at ¶ 2. His generalized assessment of change is widely shared by those well qualified to speak to the issue. *See, e.g.,* the comment of Adm James M. Loy, the recently retired Commandant of the United States Coast Guard recalled to federal service as Under Secretary of Transportation for Security: "It is so important for us as a nation to realize that we are living—and will live for a long time—in a very different security environment than we had ever experienced in all of our adult lives" (quoted in *The New York Times,* December 25, 2002, at page

A16). Indeed, these fundamental changes in the threats to public security are perfectly apparent to every individual with any awareness of what is happening in the world.

And, of course, class counsel share that awareness. "Plaintiffs also could not, and do not, claim that circumstances have not changed in the city. Acts of terrorism confront us that were but dimly perceived in 1985, if they were perceived at all." Main Brief in Opposition at 6. But class counsel contend that these general manifestations of changed circumstances are not sufficient to satisfy the first *Rufo* prong when applied to the Handschu Guidelines in particular. Thus Professor Chevigny stated at oral argument: "[T]o win this motion, the defendants are required to show not just that there is a change in circumstances—there certainly has been a change in circumstances—but that there is a change in circumstances that warrants modification of the decree." Tr. 41. He made it plain that this argument addresses the first of the two *Rufo* prongs, *change in circumstances*, and not the second, *suitably tailored to the changed circumstance:*

> But my main point with respect to that is that there is no showing therefore that there has been a significant change which warrants a change in the decree. And we would go on, of course, to say that the change that is suggested is of course not suitably tailored, which has been the point that Your Honor has concentrated on. But we think that the defendants have failed to demonstrate the first leg of the test.

*Id.* 42.

The factual predicate for this argument is found in class counsel's perception of what the Handschu Guidelines do and what they do not do. Mr. Eisenstein's declaration in opposition dated November 5, 2002 says at ¶¶ 4–5:

The Handschu Guidelines do not restrict the investigation and prevention of terrorism. They have no bearing on police action except when an investigation focuses on a group or person engaged in political activity. The Guidelines would not have interfered with investigation of the September 11th hijackers because they were involved in no protected political activity, in New York or anywhere else.

The guidelines come into play only when the NYPD intends to investigate a person or group "engaged in the exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions." (Guidelines, IIA, IVA).

In support of that view, class counsel quote from one of this Court's prior opinions in the case, reported at 737 F.Supp. 1289 (S.D.N.Y.1989). That opinion was generated by class counsel's motion to hold the NYPD in contempt of the consent decree and the Handschu Guidelines as the result of police officers' "taping and profiling of personalities speaking on radio station WLIB, a station which focuses upon news and expressions of opinion concerning the black community." *Id.* at 1292. The resolution of that contempt motion is not germane to the present issues. During the course of the opinion I said:

> The Guidelines regulate "activity" which police "undertake . . . to obtain information or evidence about the exercise" of constitutionally protected rights of expression or association. The Guidelines address police purpose and method. Only activity undertaken for the purpose of learning about citizens' exercise of rights falls within the Guidelines . . .

> The Guidelines do not undertake to sanction or proscribe in detail each conceivable form of police activity. General declarations of rights and obligations, beginning with the Constitution itself, do

not ordinarily do so. But the Guidelines' division between the purposes and methods of police activity which fall within their boundaries and those which do not is plain enough to advise the Department and citizenry alike of the navigational aids by which the constitutional course is to be steered.

*Id.* at 1301.

There is a surface appeal to class counsel's contention that the changed circumstances beginning with 9/11 do not relate to the constitutionally protected activities falling within the Handschu Guidelines boundaries, so that those circumstances do not require modification of the Guidelines. Certainly Deputy Commissioner Cohen's declarations tend on occasion to wander off the reservation. For example, in seeking to relieve the NYPD of the "criminal activity requirement" imposed by Section IV.C. of Present Handschu, Cohen avers:

> This criminal requirement as a threshold for investigative authority may effectively shield from discovery the lawful preparatory activities which invariably precede terrorist attacks. In the case of terrorism, to wait for an indication of crime before investigating is to wait far too long.

Cohen 1 at ¶ 52. And Cohen continues: "In trying to develop information about individuals who are hidden, the use of undercovers is a necessary and vital tool." *Id.* at ¶ 53.

One may grant the wisdom of these observations; indeed, I do not hesitate to do so. But if the "lawful preparatory activities" Cohen contemplates in ¶ 52 consist of conduct such as renting apartments, leasing cars, or taking flying lessons, all without any overt participation in political activities, how do the Present Handschu Guidelines extend to them, and in what manner would the Guidelines restrict police investigation of them? And if individuals are "hidden," as Cohen contemplates in ¶ 52, how do the Present Handschu Guidelines extend to members of covert cells whose very existence is inconsistent with the overt exercise of rights of freedom and expression?

Notwithstanding these considerations, I conclude that class counsel's challenge on the first *Rufo* prong fails because I cannot accept its implicit assumption: that terrorists would *never* in furtherance of their unlawful purposes participate in "lawful political, religious, educational or social activities," those being the activities engaged in by the individuals and organizations who are members of the class certified in this case at the behest of class counsel, *see* Part I.B., *supra*, and for whose protection that the Handschu Guidelines were drafted. Nor need we speculate that terrorists might on occasion avail themselves of such lawful trappings; the convicted architect of the 1993 World Trade Center bombing was the imam of a mosque. *See* Cohen 1 at ¶¶ 33–34. It is a sad reality that such use was made of a place of worship dedicated to Islam, one of the world's great religions, but a reality nonetheless.[5]

---

5. At ¶¶ 30–47 of Cohen 1, Deputy Commissioner Cohen describes a number of other individuals and organizations whose political, religious and related public activities and utterances he characterizes as "terrorist activity." Not everyone concerned would agree with that characterization; indeed, one organization, the Alavi Foundation, mentioned by Cohen in ¶ 43, retained New York counsel to lodge a vigorous protest with the Court. *See* Opinion reported at 2003 U.S. Dist. LEX-IS 20 (S.D.N.Y. Jan. 2, 2003), at *9–*12. But the accuracy of Deputy Commissioner Cohen's descriptions of these various individuals and organizations is not dispositive of this motion. The significant fact is that, as the 1993 World Trade Center bombing and its surrounding circumstances demonstrate, terrorists can and do use political, religious and social organizations to plan and promote acts of terror.

Accordingly class counsel's contention that not all terrorist activities implicate the Handschu Guidelines, clearly correct even though Deputy Commissioner Cohen sometimes sounds as if he thought they did, still falls well short of demonstrating that terrorists have never engaged in the sort of political activity addressed by the Handschu Guidelines or will never do so in the future. In that regard, it is important to note that the definition of "political activity," the same in both Present and Modified Handschu, as "the exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions," is capable of a broad or a more narrow reading. Quite clearly, class counsel intended a broad reading. They drew the boundaries of the certified class to include those who engaged in "political, religious, educational or social activities"; each of those forms of activity can be for the purpose "of maintaining or changing governmental policies or social conditions." In these circumstances, it cannot be said that "terrorist activities" do not have and can never have any relationship to the "political activities" covered by the Handschu Guidelines. It necessarily follows that the Handschu Guidelines may impose restrictions upon the NYPD's ability to investigate terrorism.

Within the context of the first *Rufo* prong, it remains to consider whether the changed circumstances crystallized by the events of 9/11 warrant revision of the Handschu Guidelines as they presently exist. I conclude without difficulty that the answer to that question must be in the affirmative.

No extended discussion is necessary. Class counsel offer no evidence, in the form of affidavits or declarations by witnesses competent to testify, to rebut Deputy Commissioner Cohen's testimony that the Handschu Guidelines' criminal activity requirement, limitations on the collection, retention and dissemination of information, and the restriction of NYPD intelligence gathering efforts to a single unit, singly and in combination, severely handicap police efforts to gather and utilize information about potential terrorist activity. The *ipse dixit* of counsel in their briefs will not suffice. The only factual approach class counsel take, *see* Eisenstein declaration at ¶¶ 14–20, is to suggest that the descriptions of past terrorist acts in Cohen 1 at ¶¶ 32–42 establish "specific information" about criminal activity as that phrase is used in Section IV.C. of Present Handschu, so that Present Handschu would not have forbidden an investigation into that conduct (albeit subject to the reporting requirements and temporal limitations also included in Section IV). The short answer to that suggestion is given in Cohen's reply declaration: "So far as is known to the NYPD, the information in those paragraphs was developed only after acts of terror had taken place, beginning with the World Trade Center bombing in 1993.... The criminal predicate for those investigations was the terrorist act. The paragraphs in my declaration reflect the benefit of hindsight." Cohen 2 at ¶ 4.

With respect to Present Handschu's conditioning an intelligence investigation into political activities (broadly conceived, as noted *supra*) upon NYPD possession of specific knowledge of criminal activity (the "criminal activity requirement"), no basis is discernible for doubting Deputy Commissioner Cohen's testimony that where the requirement is not met, "the Guidelines prevent the NYPD from investigating seemingly neutral leads which may provide links to planned actions," Cohen 1 at ¶ 50; that "[t]he determination of whether or not there is specific information suggesting criminal activity may be a difficult one," *id.* at ¶ 51; and that under the Guidelines, unless the criminal activity requirement is

satisfied, the NYPD cannot avail itself of such important information-developing methods as undercovers, electronic or mechanical surveillance (such as tape recorders and video cameras) in the investigation of individuals engaged in political, religious, educational or social activities as a means of furthering or concealing terrorist goals, *id.* at ¶¶ 53–55. With respect to Present Handschu's restrictions on NYPD collection and retention of information, no basis is discernible for doubting Cohen's testimony that law enforcement's ability to detect and guard against future terrorist attacks depends in large measure upon "the ability to collect, share and analyze information," Cohen 1 at ¶ 59; and that the Guidelines "place significant limitations on the information that the NYPD may collect, retain, index and share, which severely impact the vital cooperation among law enforcement agencies envisioned by Congress," [6] by restricting retention of information to that obtained by an investigation where the criminal activity requirement was met, *id.* at ¶ 65, prohibiting the NYPD from preparing and keeping written reports about information gleaned from television, the radio, or the internet,

*id.,* and requiring Authority approval before retaining information about "whether an individual provided monetary support to a political group or otherwise supported its aims, or that an individual's name appears on a mailing list," *id.* at ¶ 66.

With respect to the dissemination of even that information obtained and retained by the NYPD in accordance with Present Handschu's several restrictions, no basis is discernible for doubting Cohen's testimony that the Guidelines' further limitations upon dissemination of that information "only to law enforcement agencies or to government. agencies collecting security clearance procedures who agree in writing to comply with the Guidelines," Cohen 1 at ¶ 67, significantly obstruct the NYPD's Intelligence Division's vital ability "to work in close partnership not only with federal government but with every state, thousands of municipalities, and other countries as well." *Id.* at ¶ 70. Deputy Commissioner Cohen's assessment of Present Handschu's restrictions on the NYPD's ability to disseminate information—"[i]t is difficult to imagine a state of affairs more outdated by the events of September 11th or out of step with the urgent needs of our law enforcement agencies," *id.*—is an exercise in common sense.[7]

---

**6.** This is a reference to the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT) Act of 2001, Pub.L. No. 107–56 (codified in scattered titles of the United States Code), enacted by the Congress post–9/11, which *inter alia* explicitly legalized the sharing of information between the FBI and CIA, and "recognized the important intelligence role of local law enforcement in gathering information at the grass roots level by expanding the Department of Justice Regional Information Sharing Systems Program to include establishing and operating secure information sharing systems to enhance the participants' ability to address multi-jurisdictional terrorist conspiracies and activities." Cohen 1 at ¶ 61 (citing to section 701 of the Act, 50 U.S.C. § 403–5b).

**7.** In fairness to class counsel, their initial response to the present motion reflected a

recognition that the Handschu Guidelines' restrictions on the dissemination of information by the NYPD might have to be revised. *See* Eisenstein declaration dated November 5, 2002 at ¶ 29 ("We stand ready to work with the defendants in revising these rules to make them reflective of the ways records are now kept, and responsive to the need for sharing information that has been properly gathered."). (I take the phrase "properly gathered" to mean an investigation initiated and conducted in accordance with Present Handschu). But class counsel's willingness to parley on the dissemination issue, laudable in itself, does not lessen this Court's independent obligation to determine, on the NYPD's contested motion to modify the consent decree, whether changed circumstances warrant modification of the Guidelines. Present Handschu's restrictions on information dissemination form a part of that evaluation.

Finally, no basis is discernible for doubting Cohen's testimony that Present Handschu's restricting "intelligence investigations of political activity to personnel assigned to a single unit within the Intelligence Division" is counterproductive, since given the range of activities that may be engaged in over time in preparation for a terrorist act, "the entire resources of the NYPD must be available to conduct investigations into political activity and related intelligence issues." Cohen 1 at ¶ 81.

For the foregoing reasons, I conclude that the NYPD has made the threshold showing required by *Rufo* that changed circumstances of fact warrant modification of the present Handschu Guidelines.

### D. Suitably Tailored: the Second *Rufo* Prong

■ To modify the consent decree and the Handschu Guidelines in the manner it requests, the NYPD is also required by the Supreme Court's decision in *Rufo* to show that "the proposed modification is suitably tailored to the changed circumstance." 502 U.S. at 393, 112 S.Ct. 748. Class counsel contend that the NYPD's proposals are not so much a modification of the Guidelines as an elimination of them; they go too far; the tailoring is unsuitable.

Judicial evaluation of whether a particular modification of a particular consent decree regulating local government conduct is "suitably tailored" to a particular changed circumstance is necessarily fact-intensive. But the *Rufo* Court gave lower courts guidance—one might even say "guidelines"—when it said: "In evaluating a proposed modification, three matters should be clear." *Id.* at 391, 112 S.Ct. 748. First, "a modification must not create or perpetuate a constitutional violation." *Id.* Second, "[a] proposed modification should not strive to rewrite a consent decree so that it conforms to the constitu-

tional floor." *Id.* Third, "[w]ithin these constraints, the public interest and considerations based on the allocation of powers within our federal system require that the district court defer to local government administrators, who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Id.* (citations and internal quotation marks omitted).

The first of these consent decree modification guidelines requires little discussion. The Modified Handschu Guidelines do not "create or perpetuate a constitutional violation." They reiterate the policy statement of Present Handschu that "[a]ctivities of the New York City Police Department in the investigation of police activity will conform to constitutionally guaranteed rights and privileges." While Modified Handschu does indeed eliminate a number of Present Handschu's restrictions on NYPD investigative conduct, the question is whether freeing the NYPD of those restrictions means that its subsequent conduct will violate the Constitution. But that proposition does not follow. In this regard the case is comparable to *Alliance to End Repression v. City of Chicago*, 237 F.3d 799 (7th Cir.2001) (Posner, *Ct. J.*), where the Seventh Circuit, holding that the Chicago Police Department's motion to modify a consent decree imposing restrictions on investigations "likely to involve the collection of [First Amendment] protected activity or the investigation of anyone engaged in such activity," *id.* at 800, should be granted, said of the more flexible procedures the Chicago police wished to adopt "to meet new threats to the safety of Chicago's citizens" by "keep[ing] tabs on incipient terrorist groups":

> All this the First Amendment permits (unless the motives of the police are improper or the methods forbidden by

the Fourth Amendment or other provisions of federal or state law), but the [original] decree forbids.

237 F.3d at 802 (citation omitted).[8]

The principal dispute on this aspect of the case turns upon the second *Rufo* caveat, namely whether, as class counsel contend, the NYPD's proposed modifications to the Handschu Guidelines would impermissibly cause the Guidelines and the consent decree to descend all the way to the "constitutional floor." Analysis begins with the *Rufo* Court's explanation of what it meant by that architectural phrase:

> Once a court has determined that changed circumstances warrant a modification in a consent decree, the focus should be on whether the proposed modification is tailored to resolve the problems created by the change in circumstances. A court should do no more, for a consent decree is a final judgment that should be reopened only to the extent that equity requires. The court should not turn aside to inquire whether some of the provisions of the decree upon separate as opposed to joint action could have been opposed with success if the defendants had offered opposition.

502 U.S. at 391–92, 112 S.Ct. 748 (citations and internal quotation marks and bracketing omitted).

■ The proper application in a given case of the principle that a consent decree "may be reopened only to the extent that equity requires" is, once again, a fact-intensive inquiry. The trial judge acting as chancellor must balance the equities in deciding how close to the Constitution's minimum demands—the "constitutional floor"—the modifications may be allowed to come. The process necessarily includes an evaluation of the cost or risk to the public if the descending modification elevator is required to halt at the second or third level above the floor. In *Rufo*, the cost to the public was the expense of building larger jails so that the Sheriff would not need to engage in double celling. In the case at bar, the risk to the public if the Handschu Guidelines are not modified sufficiently to allow the NYPD to combat terrorism is qualitatively different.

The Seventh Circuit engaged in such a balancing process in *Alliance to End Repression v. City of Chicago and the United States Department of Justice*, 742 F.2d 1007 (7th Cir.1984) (*en banc*), which held that then Attorney General Smith's new guidelines for FBI investigations did not violate the prior consent decree entered in the case. The FBI guidelines were revised in circumstances created by increased domestic terrorism: Judge Posner's opinion for the *en banc* court observed that "[b]etween 1970 and 1980, domestic terrorist organizations committed more than 400 bombings in the United States," 742 F.2d at 1015; he went on to say of the less restricted FBI guidelines:

> Admittedly the repressive effect will not be zero. No one wants his name in an investigatory FBI file; and the knowledge that the FBI investigates groups that advocate violent change could deter some people from joining such groups and deter groups themselves from engaging in lawful though

---

**8.** In *Rufo*, the concern that the consent decree modification might create or perpetuate a constitutional violation arose from the narrow issue posed by the modification's proposed double celling of inmates at the Suffolk County jail. The Sheriff contended that double celling would be constitutional in view of a recent Supreme Court case. The plaintiff inmates contended that "double celling at the new jail would violate the constitutional rights of pretrial detainees." 502 U.S. at 391 n. 13, 112 S.Ct. 748. The district court had not decided that issue in its opinion on the Sheriff's motion to amend the consent decree; the Supreme Court directed it to do so on remand.

minatory forms of advocacy. There would therefore be a cost to the values protected by the First Amendment, if the groups never stepped over the boundary that separates privileged from indictable speech. But we think the cost would be outweighed by the benefits in preventing crimes of violence, provided that the FBI did not prolong its investigation after it became clear that the only menace of a group under investigation was rhetorical and ideological.

*Id.* at 1016. Similarly in the case at bar: the NYPD's ability to conduct investigations pursuant to the Modified Handschu Guidelines may be purchased at "a cost to the values protected by the First Amendment"; the modification elevator may have descended close to the constitutional floor. But that descent may be justified by the unprecedented current public dangers of terrorism, unimaginable even during the decade referred to by the Seventh Circuit in *Alliance*—perils sufficient to outweigh any First Amendment cost inherent in the modifications the NYPD asks the Court to approve.

Does the NYPD, by its proposed Handschu Guideline modifications, "strive to rewrite a consent decree so that it conforms to the constitutional floor," in violation of the second *Rufo* principle, so that this Court should reject them? Class counsel say "yes." Corporation Counsel say that three factors keep the modifications sufficiently elevated above the floor: Modified Handschu's policy statement that police investigations of political activity will "conform to constitutionally guaranteed rights and privileges"; the continued existence of

the Handschu Authority (albeit with diminished powers and altered responsibilities); and the NYPD's undertaking, recently expressed by Deputy Commissioner Cohen, to include the substance of the 2002 FBI Guidelines in the NYPD patrol guide.

As for the policy statement, a comparable declaration in the Chicago consent decree appears to have impressed Judge Posner; he said in *Alliance,* 237 F.3d at 800:

> The core of the decree, which the City does not seek to modify, forbids investigations intended to interfere with or deter exercise of the freedom of expression that the First Amendment protects, and requires the City to commission independent periodic audits of the City's compliance with the decree. The effect of these provisions is to add the threat of civil and criminal contempt to the usual sanctions for infringing civil rights and, through the requirement of the audits, to make it easier to detect such infringements. These are substantial enhancements of the ordinary deterrent effect of constitutional law. They annex swift and severe sanctions to the ordinary tort remedies (mainly 42 U.S.C. § 1983) for violations of that law.

Neither Present nor Modified Handschu contain any provision for independent periodic audits of NYPD compliance with them.[9] The question therefore arises whether Modified Handschu's repetition of Present Handschu's policy statement that the NYPD will not violate the Constitution, standing alone, qualifies Modified Handschu as a consent decree modification that

---

9. The Chicago consent decree, which imposed upon the Chicago police restrictions comparable to those of Present Handschu, obligated the Chicago Board of Police to *inter alia* "audit, monitor and evaluate compliance with this Judgment," and "cause management audits to be conducted, by a national independent accounting firm, of the implementation of and compliance with this Judgment and the regulations adopted" thereunder, such audits to be "conducted in 1982, 1984, and thereafter at intervals of not more than five years," the reports to be made public. *See Alliance v. City of Chicago,* 561 F.Supp. 537, 568–69 (N.D.Ill.1982).

does *not* "conform to the constitutional floor." One cannot easily conclude that it does. A party's promise in an original consent decree to obey the Constitution, with the attendant additional sanctions of civil and criminal contempt if the promise is broken, may incline a court to regard the decree as a fair and reasonable settlement of the underlying disputes. But Present Handshcu is a part of the original consent decree, and the NYPD's motion seeks to modify it by eliminating all restrictions and limitations on police investigative activity other than the constitutional policy statement. What more could the NYPD do in order to descend all the way to the constitutional floor? The Constitution will continue to provide the benchmarks by which police conduct will be measured; it would do so even if Modified Handschu contained an explicit provision purporting to repeal the Constitution. Conceptually at least, the NYPD could have moved to vacate the consent decree rather than modify it, but it has sought modification, and accordingly the *Rufo* principles apply. I do not think the Modified Handschu's constitutional policy statement, standing alone, preserves them from a disfavored descent to the constitutional floor.

But that statement does not stand alone. The Handschu Authority continues to exist. Under Section V of Modified Handschu, a person or member of a group or organization "having reason to believe" that NYPD investigation of political activities have violated constitutionally guaranteed rights and privileges may request in writing "that the Authority make inquiry of the appropriate investigative officer of the NYPD"; the Authority is thereupon obligated to determine whether the investigation was or was not "conducted in accordance with the Constitution," and notify the requesting party of its conclusion. The template is that of Present Handschu; the difference is that the Authority's inqui-

ry under Present Handschu is to determine whether the police investigation conformed to the restrictions imposed by the Guidelines, while the Authority's Modified Handschu inquiry is whether the investigation complied with the Constitution.

Notwithstanding this change, I think that the continuing accessibility of the Handschu Authority to the public, coupled with the Authority's responsibility to ask the NYPD to account for itself and the Authority's obligation to report back to the requesting party, create, in Judge Posner's phrase, "substantial enhancements of the ordinary deterrent effect of constitutional law." *Alliance*, 237 F.3d at 800. Consider the situation of a member of the public who is also a member of the class certified in this case, and who believes that a police investigation into his activities has violated his constitutionally protected rights and freedoms. Let us call this person (in keeping with tradition) "John Doe." Because the police conduct, whatever it might be, was "under color of state law," John Doe's principal legal remedy is found in the civil rights laws, particularly 28 U.S.C. § 1983. If Modified Handschu did not include Section V, John Doe would have to develop the facts and file a complaint *pro se*, or find a lawyer willing (probably on a contingent fee basis) to do it for him. By invoking Section V, John Doe is assured that a formidable body (two police officers of exalted rank and a civilian member who is a Mayoral appointee) will seek out and question the NYPD commander involved in order to determine the constitutionality of the NYPD's investigation of John Doe and report to John Doe the outcome, all without effort or expense to him. All Section V requires John Doe to do is show the Authority that he has "reason to believe" the NYPD has violated his constitutional rights: not too high a bar to set.

One can readily discern in Section V of Modified Handschu significant enhancements of the remedies secured to the public by the Constitution and the civil rights laws and the deterrent effect of those laws on unlawful police conduct. First, Section V gives the John Does of the City a very considerable leg up in pressing their claims. If the Authority reports to John Doe that no constitutional violation occurred, he may be disappointed, but his right to file a § 1983 action is undiminished. Second, NYPD commanders will surely be aware that investigations for which they are responsible may have the unwanted effect of having the Handschu Authority come to call.

I come now to the 2002 FBI Guidelines, whose substance Deputy Commissioner Cohen says will be included in the NYPD patrol guide if the Court approves Modified Handschu. This is a relevant consideration in the "constitutional floor" analysis required by *Rufo*. A salient feature of the FBI Guidelines is that they do not do away entirely with the "criminal activity requirement" which is a principal cause of the NYPD's dissatisfaction with Present Handschu. The FBI Guidelines provide for three graduated levels of investigative activity: (1) "checking initial leads," authorized "whenever information is received of such a nature that some follow-up as to the possibility of criminal activity is warranted," Instruction A at page 1; (2) a "preliminary inquiry," authorized "when there is information or an allegation which indicates the possibility of criminal activity and whose responsible handling requires some further scrutiny beyond checking initial leads," *id.*; and (3) a "full investigation," authorized "when facts or circumstances reasonably indicate that a federal crime has been, is being, or will be committed," Part II.C. at page 10.[10] The standard of "reasonable indication" is "substantially lower than probable cause. However, the standard does require specific facts or circumstances indicating a past, current, or future violation. There must be an objective, factual basis for initiating the investigation; a mere hunch is insufficient." Part II.C. at page 10. In addition to these three investigative levels, the FBI Guidelines authorize in Part VI certain "counterterrorism activities," divided into "information systems" and "visiting public places and events," which "can be carried out even in the absence of a checking of leads, preliminary inquiry, or full investigation as described in Parts I–III of these Guidelines." Part VI at page 21. There is no "reasonable indication" standard that must be met before engaging in the activities authorized by Part VI.

Inclusion of the substance of these FBI Guidelines in the NYPD patrol guide would not preserve the restrictions of Present Handschu; on the contrary, it is those restrictions that the NYPD wishes to avoid by this motion to modify the consent decree. But there is sufficient restrictive content in the FBI Guidelines to warrant their consideration in the modification calculus. Class counsel say that the NYPD's promise to include the substance of the FBI Guidelines in its patrol guide should not be considered on this motion because the promise comes too late; the NYPD

---

**10.** Part II of the FBI Guidelines, quoted in text, deals with "general crimes investigations." Part III deals with "criminal intelligence investigations," a category subdivided into "racketeering enterprise investigations," Part III.A., and "terrorism enterprise investigations," Part III.B. A terrorism enterprise investigation is authorized "when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of" violating various provisions of federal law. "The standard of 'reasonable indication' is identical to that governing the initiation of a general crimes investigation under Part II." Part III.B.1.a. at pages 15–16.

may not keep the promise; it may excise the material from the patrol guide after the Court approves Modified Handschu; and, unlike the consent decree, the contents of the patrol guide confer no rights upon class members.

These arguments do not persuade. It is true that the NYPD's undertaking to adopt the substance of the FBI Guidelines was not a part of its modification motion when filed, but the subsequent briefings, declarations, Court hearings, and interim opinions and orders have amounted to a process of evolution, whose by-product should not be discarded if it is helpful. There is no reason not to take Deputy Commissioner Cohen at his word when he promises that the patrol guide will be revised to include the substance of the FBI Guidelines, and if a modified consent decree mandates that the revision be permanent, there is no reason to believe that the material will subsequently be removed.

As for the ability of class members to take advantage of the contents of the patrol guide, the NYPD undoubtedly has in mind including language comparable to that with which the FBI Guidelines concludes:

> These Guidelines are set forth solely for the purpose of internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the Department of Justice.

Part VII.C. The scope of these reservations is clear enough. Because the Guidelines do not "create any rights ... enforceable at law," a private party cannot base an action upon an alleged violation of them. Because the Guidelines do not "place any limitation on otherwise lawful" FBI conduct, the agency remains free to engage in any investigatory activity that the Constitution or any relevant statute does not forbid.

But it does not follow that the inclusion of the substance of the FBI Guidelines in the NYPD patrol guide would be entirely meaningless to class members who have reason to believe that the NYPD has violated their constitutional rights and freedoms. In civil rights actions brought to enforce rights created by the Constitution and § 1983, the contents of police patrol guides or other internal procedural guidelines have been regarded as relevant to a determination of whether a violation of such rights occurred. *See, e.g., Latino Officers Association v. City of New York*, No. 97 Civ. 1384, 1998 WL 80150 (S.D.N.Y. Feb. 25, 1998) (in action by Latino police officer association to remedy alleged violations of their free association rights by the NYPD, court considered plaintiffs' claim that the NYPD "violated its own Patrol Guide, Guideline 117–17, which reflects the standards of settlement approved in" *Handschu II);*[11] *Aboulissan v. City of New York*, No. CV–88–0420, 1991 WL 37067 (E.D.N.Y. March 15, 1991) (in action alleging that a narcotics investigation violated plaintiff's Fourth Amendment rights, court directed production of relevant and non-sensitive portions of the Organized Crime Control Bureau Narcotics Division Manual of Procedures); *Jones v. Chieffo*, 833 F.Supp. 498 (E.D.Pa.1993) (in action alleging Fourth and Fourteenth Amendment violations arising out of high speed automotive police chase and subsequent automobile collision, court held that offi-

---

**11.** If the Court approves Modified Handschu on condition that the NYPD include the substance of the FBI Guidelines in the patrol guide, then the patrol guide would "reflect the standards" of the Constitution.

cer's disregard of existing police directive on pursuits was relevant on issue of liability, although "[v]iolation of police pursuit guidelines are not dispositive that a police officer acted with reckless indifference to the public safety. Other factors are also relevant.") (citation omitted). Given these factors, I decline to hold that the Supreme Court's decision in *Rufo* mandates this Court's rejection of Modified Handschu on the ground that the modifications impermissibly conform to the constitutional floor.

The third *Rufo* decree modification guideline commands me "to give significant weight to the views of the local government officials who must implement any modification," a concept rooted in "principles of federalism and simple common sense," 502 U.S. at 392 n. 14, 112 S.Ct. 748. It is those local officials, the *Rufo* Court stressed, "who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform," *id.* at 391, 112 S.Ct. 748.

In the case at bar, the "institutional reform" at stake relates to the NYPD's intelligence-gathering activities in a time of unprecedented terrorist threats. Deputy Commissioner Cohen has a primary responsibility within the NYPD, second only to that of Police Commissioner Kelly, for assessing current threats to the public safety and solving the problems generated by those threats. He expresses his views on those core issues in his three declarations, submitted in support of the proposed modifications, and I am obedient to the command of *Rufo* that I give those views significant weight.

\* \* \* \* \* \*

In this American democracy, government is obligated by its compact with the citizens who consent to be governed to preserve for each the freedoms and rights conferred by the Constitution, while at the same time ensuring the safety of all. Ten-

sions between these responsibilities of government, executive and legislative, inevitably arise, as they have in this case. It falls to the judicial branch to resolve them.

The Constitution's protections are unchanging, but the nature of public peril can change with dramatic speed, as recent events show. The Handschu Guidelines approved in the 1985 consent decree addressed different perils in a different time. While the Seventh Circuit's decision in *Alliance*, 237 F.3d 799, modifying the Chicago police consent decree, is not binding on this Court, its rationale is both applicable and persuasive:

> In the heyday of the Red Squad, law enforcers from J. Edgar Hoover's FBI down to the local level in Chicago focused to an unhealthy degree on political dissidents, whose primary activity was advocacy though it sometimes spilled over into violence. Today the concern, prudent and not paranoid, is with ideologically motivated terrorism. The City does not want to resurrect the Red Squad. It wants to be able to be able to keep tabs on incipient terrorist groups. New groups of political extremists, believers in and advocates of violence, form daily around the world. If one forms or migrates to Chicago, the decree renders the police helpless to do anything to protect the public against the day when the group decides to commit a terrorist act. Until the group goes beyond the advocacy of violence and begins preparatory actions that might create reasonable suspicion of imminent criminal activity, the hands of the police are tied. And if the police have been forbidden to investigate until then, if the investigation cannot begin until the group is well on its way toward the commission of terrorist acts, the in-

vestigation may come too late to prevent the acts or to identify the perpetrators.

237 F.3d at 802. This is a prescient analysis. The Seventh Circuit decided *Alliance* on January 11, 2001: eight months to the day before 9/11.

In this case, mindful of the crucial importance of preserving both individual freedoms and public safety, and balancing the legitimate demands of those two goals to the best of my ability, I conclude that the NYPD is entitled to a conditional order of the Court approving the proposed modifications to the consent decree and to the Handschu Guidelines. The nature of the condition is described in Part III, *infra.*

### III. CONCLUSION

For the reasons stated, the Court will enter a modified decree and approve the modifications to the Handschu Guidelines the NYPD proposes, upon compliance by the NYPD with the following conditions:

1. No later than February 21, 2003, the NYPD must file with the Court and serve upon class counsel the text to be included in the patrol guide which sets forth the substance of the FBI Guidelines.

The parties should note, in connection with this condition, that because the patrol guide is an internal NYPD document, the Court will not entertain detailed objections or suggestions as to what the patrol guide should or should not say in that regard. The Court's function will be to determine whether the text proposed to be included in the patrol guide adequately reflects the substance of the FBI Guidelines. Class counsel may address that issue by written submissions, to be filed and served not later than ten (10) days after service upon them of the text. I phrase the direction in that manner so that the NYPD under-

stands that it can file and serve the text *earlier* than February 21, 2003, if it is able to do so. The NYPD may reply to such submissions, if made, within seven (7) days of their service.

2. Not later than ten (10) days after an Order of the Court is issued declaring that the NYPD has complied with Condition 1 (if such Order be forthcoming), the NYPD must file with the Court and serve upon class counsel an affidavit or declaration by an officer of sufficient rank, attesting that patrol guides containing the text contemplated by Condition 1 have in fact been distributed to all unit commanders involved, with directions to call the text to the attention of the police officers under their command.

If the NYPD complies with these conditions, the Court will enter an Order modifying the decree and approving the modifications of the Handschu Guidelines. That Order will provide that the text contemplated by Condition 1 will remain in the NYPD patrol guides unless otherwise directed by the Court.

If the Order referred to in the preceding paragraph is entered, its execution will be stayed for ten (10) calendar days, following which the modifications to the present Handschu Guidelines will come into effect. Any further stay of the Order must be obtained from the Court of Appeals.

It is SO ORDERED.

### APPENDIX A

### *DEFENDANTS' PROPOSED MODIFIED GUIDELINES*

### GENERAL STATEMENT OF POLICY

Activities of the New York City Police Department in the investigation of Political

activity will conform to constitutionally guaranteed rights and privileges.

## II. DEFINITIONS

### A. *Political Activity*

The exercise of a right of expression or association for the purpose of maintaining or changing governmental policies or social conditions.

### B. *Authority*

A board established pursuant to Section III of these Guidelines.

### C. *Investigation*

A police activity undertaken to obtain information or evidence

### D. [DELETED]

### E. [DELETED]

## III. AUTHORITY ESTABLISHED

There is hereby established an Authority to conduct the review of records described in paragraph V. It shall consist of three members who shall act as a body, to wit, the Deputy Commissioner for Legal Matters of the Police Department, the Chief of Internal Affairs of the Police Department, and a civilian member appointed by the Mayor upon consultation with the Police Commissioner for a term revocable at will. § The decisions of the Authority as set forth herein shall be by majority vote.

## IV. CONDUCT OF INVESTIGATIONS AND ROLE OF AUTHORITY

[DELETED]

## V. REVIEW OF RECORDS TO DETERMINE COMPLIANCE

A. At any time a person or member of a group or organization, having reason to believe that such person, group or organization has been the subject of investigation of political activity which violates constitutionally guaranteed rights and privileges, may request in writing which sufficiently identifies the requesting party that the Authority make inquiry of the appropriate investigative officer of the NYPD. If the Authority's inquiry reflects that the investigation was conducted in conformity with the Constitution, the Authority shall notify the requesting party that if an investigation was made, it was made in accordance with the Constitution.

B If the inquiry reveals or if the Authority otherwise becomes aware of that an investigation was not conducted in conformity with the Constitution with respect to the requesting party, the Authority shall proceed as follows:

1. The Authority shall obtain all information and documents pertaining to the requesting party developed in the course of such investigation.

2. The Authority shall conduct or cause to be conducted an inquiry into the circumstances of such investigation with respect to the requesting party.

3. In the event the inquiry determines that such investigation with respect to the requesting party, was not conducted in accordance with the Constitution, the Authority shall so notify the requesting party and submit a report to the Police Commissioner.

VI. PERMITTING ENTRIES TO FILES AND INDEX CARS [sic] OF PUBLIC SECURITY SECTION -- SPECIFIC CRITERIA

[DELETED]

VII. DISSEMINATION OF RECORDS

[DELETED]

VIII. REVIEW OF PROCEDURES

[DELETED]

IX. REPORTING REQUIREMENT

[DELETED]