Barbara HANDSCHU, Ralph Digia, Alex McKeiver, Shaba OM, Curtis M. Powell, Abbie Hoffman, Mark A. Segal, Michael Zumoff, Kenneth Thomas, Robert Rusch, Anette T. Rubenstein, Michey Sheridan, Joe Sucher, Steven Fischler, Howard Blatt and Ellie Benzone, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

SPECIAL SERVICES DIVISION, a/k/a Bureau of Special Services, William H.T. Smith, Arthur Grubert, Michael Willis, William Knapp, Patrick Murphy, Police Department of the City of New York, John v. Lindsay and various unknown employees of the Police Department acting as under-cover operators and informers, Defendants.

No. 71 Civ. 2203(CSH).

United States District Court, S.D. New York.

Aug. 6, 2003.

Paul G. Chevigny, Jethro M. Eisenstein, Profeta & Eisenstein, Martin R. Stolar, Franklin Siegel, Attorneys for plaintiff class, Arthur Eisenberg, New York Civil Liberties Union, appearing with attorneys for plaintiff class, New York City, for Plaintiffs.

Gail Donoghue, Corp. Counsel of City of New York, New York City, for defendant.

## MEMORANDUM OPINION

HAIGHT, Senior District Judge.

In this class action involving certain conduct on the part of the New York City Police Department ("NYPD"), represented by the office of the Corporation Counsel, the attorneys for the certified class ("Class Counsel") move for reconsideration of the Court's Revised Order and Judgment entered on dated April 8, 2003 (the "Order and Judgment"), and to alter or amend it.[1] The NYPD resists the motion.

## I. BACKGROUND

The history of this action prior to the entry of the Order and Judgment on April 8, 2003 is stated in detail in the Court's opinion dated February 13, 2003, No. 71 Civ. 2203, 2003 WL 302258 (S.D.N.Y. Feb. 13, 2003) ("the February Opinion" or "the Opinion"). Familiarity with that opinion is assumed. Its detailed history need not be repeated.

The Order and Judgment implemented the February Opinion's ruling which granted the NYPD's motion to modify the Handschu Guidelines, on condition that the NYPD include in its Patrol Guide an adapted version of the FBI Guidelines approved by the Court after consideration of comments by Class Counsel. The NYPD captioned the adapted Guidelines as "Guidelines for Investigations Involving Political Activity" (hereinafter "NYPD Guidelines"). While the Order and Judgment's third decretal paragraph required that the NYPD Guidelines "remain in the NYPD Patrol Guide unless otherwise directed by the Court," it did not specifically incorporate the NYPD Guidelines as an integral part of the Order and Judgment. In that regard, Class Counsel contended then and contend now, the Order and Judgment differed from the order and judgment approving the original Handschu Guidelines, see 605 F.Supp. 1384 (S.D.N.Y. 1985), aff'd., 787 F.2d 828 (2d Cir.1986). That omission, when coupled with a "reser-

---

1. The Order and Judgment entered on April 8, 2003, revised an earlier order and judgment entered on March 20, 2003. The circum-stances which necessitated the revision are not pertinent to the present motion.

vations" provision in the NYPD Guidelines that the Guidelines do not "create any rights, substantive or procedural, enforceable by any party in any matter, civil or criminal,"[2] discomfited Class Counsel Class because, in their view, the NYPD was thereby immunized from being held in contempt of a Court order if it subsequently violated the Guidelines.

Notwithstanding these professed misgivings on the part of Class Counsel, the litigants greeted the result achieved by the Judgment entered on April 8, 2003 with unanimous acclaim. Corporation Counsel and Class Counsel issued separate statements to the media, expressing a lively satisfaction with the outcome (although the stated reasons for their approval were somewhat different). Class Counsel announced that they would not appeal from the Order and Judgment. The NYPD had no issue to raise on appeal.

However, beneath these deceptively calm seas, unknown at the time by counsel and the Court, troublesome tides were running which led to the present motion. The circumstances which transformed accord into discord are these.

The United States' impending invasion of Iraq generated considerable public protest in the New York City area. Anti-war demonstrations were held on the streets of Manhattan on February 15, March 22, and March 27, 2003. The NYPD was responsible for maintaining order during these rallies, including keeping the demonstrators within areas defined by the NYPD and approved by this Court and the Second Circuit. During the February 15 rally, the police arrested 274 persons "for conduct ranging from blocking traffic to assault on police officers." Declaration of Inspector John W. Cutter, Commanding Officer of the Criminal Intelligence Section of the Intelligence Division ("INTEL") of the NYPD dated May 15, 2003 ("Cutter Decl.") at ¶ 15. Additional arrests for similar conduct were made during the March 22 and March 27 rallies.

As the result of public statements by protest organizers prior to the February 15 rally, as well as "other specific information," the NYPD had reason to believe that "particular groups intended to engage in unlawful conduct at the February 15th event." Cutter Decl. at ¶ 14. In preparation for that conduct and the arrests that would surely follow, Inspector Cutter prepared what was captioned a "Demonstration Debriefing Form" for INTEL officers to use in questioning arrested persons while in custody. The section titled "Subject Information" contained the usual "pedigree" questions, but also had lines to fill in captioned "Organization Name," "Organization Position," "School Name," and "Prior Demonstration History." Inspector Cutter says that the "question about the school attended by the arrestee" was designed "to help confirm information about certain educational institutions used by some groups as a base for planning disruptive activities." Id. at ¶ 16. He says further that "[i]ndividuals voluntarily made a personal choice about whether to answer questions asked by INTEL officers," and that "[b]ased on my interviews with INTEL officers who conducted interviews of individuals arrested at these events, they asked only the questions contained in the debriefing form." Id. at ¶¶ 17, 20.

A quite different picture is painted by 12 affidavits Class Counsel submit, sworn to by individuals who were arrested and questioned in connection with one or more

---

2. The full text of the Reservations provision in the NYPD Guidelines appears in the February

Opinion, 2003 WL 302258, at *19.

of the three events.[3] These individuals say that, following their arrests, they were questioned by plainclothes NYPD officers. The questions included the following:

Why did you come to New York today?

How do you feel about the war?

Do you hate George W. Bush?

Do you think anything would be different if Al Gore were elected?

Who did you come with?

Were you one of the sit-down arrests?

Do you go to school?

Where?

What do you study?

Do you think anyone in Ithaca uses drugs?

Do you know anyone in Ithaca who uses drugs?

Do you know when the next peace rally will be?

Who did you come to the demonstration with?

How did you get there?

Where did you park your car?

What subway stop did you get on and off at?

What group are you affiliated with?

Why are you here at the demonstration?

Have you been to any protests in the past? Where? When?

Are you planning on going to any protests in the future?

At which website did you find out about the demonstration?

What will you be doing and where are you going when you are released?

Do you do any kind of political work?

Where are you employed?

Do you do other kinds of anti-war work?

Did you meet with a group?

Do you know any of the groups involved in the rally?

What are your political affiliations?

Are you staying with anyone?

What is your opinion on the war in Iraq?

Don't you think it was necessary for us to get involved in World War II?

Where have you traveled lately?

Have you ever traveled to the Middle East?

Have you ever been to Africa?

One affiant says she was told "that I would not be released until I spoke with a detective. I was held for 15 hours before receiving a desk appearance ticket."[4]

While I accept Inspector Cutter's averment that INTEL officers conducting these interviews told him that "they asked only the questions contained in the debriefing form," it seems clear that the interrogations conducted by at least some officers went far beyond the form. The affidavits of the twelve arrestees reveal a pattern in the inquiries, and it is fanciful to suggest that they are all inventing questions they were never asked.

Inspector Cutter states further that "[w]hen provided, responsive information was recorded on the debriefing form[5] and entered into a data base. The forms were then destroyed." Cutter Decl. at ¶ 17.

According to accounts appearing in The New York Times issues of April 10 and 11, 2003, the New York Civil Liberties Union wrote to NYPD Commissioner Raymond W. Kelly to complain about the "debrief-

---

3. The affidavits are exhibits to the declaration of Jethro M. Eisenstein, one of Class Counsel, dated May 23, 2003.

4. Affidavit of Katherine S. Hardy, verified May 22, 2003.

5. Of course, there were no spaces on the debriefing form to record answers to the questions the arrested demonstrators say they were asked.

ing" practices. In an article in the April 10 issue at page D1, an NYPD spokesman was quoted as saying that "Police Commissioner Raymond W. Kelly and his deputy commissioner for intelligence, David Cohen, a former top Central Intelligence Agency official, did not know the debriefing form was in use"; the article added that "after the practice came to light, the Police Department said it would destroy the database, created with a debriefing form, and largely abandon the initiative, which civil libertarians and constitutional law experts said was deeply troubling." An article in the Times April 11 issue at page D5 reported that at a news conference Commissioner Kelly said the practice "was neither illegal nor unconstitutional," being instead a "good faith effort to develop information that would help police officials determine how to deploy officers at future demonstrations." Kelly confirmed, however, that neither he nor deputy commissioner Cohen "knew about the practice," and added that "he had ordered that no such forms be created in the future without the approval of his senior intelligence aide, the deputy commissioner of intelligence." For his part, Inspector Cutter says in his declaration at ¶¶ 21 and 22 that "[o]n or about April 8, 2003 my superiors directed that the use of the debriefing form be discontinued and the information recorded in the database deleted," directions which Cutter says he obeyed, although adding that "[a]nalysis of the information provided by the arrested demonstrators of a statistical nature and in anonymous form bearing no identification to any person, was retained by INTEL to be utilized in planning the policing of future demonstrations."

In these circumstances, Class Counsel move to amend the April 8, 2003 Order and Judgment which modified the consent decree and implemented the Modified Handschu Guidelines, so as to incorporate those Guidelines into the Order and Judgment. The Court has received briefs and heard oral argument. Class Counsel make the dramatic charge that "[t]he intelligence division activities that have recently come to light make it clear that the NYPD does want to resurrect the Red Squad. These activities show that one of the purposes behind the effort to eviscerate the consent decree was to free the NYPD to collect information about political activity as it did in the past." Eisenstein declaration at ¶ 16 (internal quotation marks omitted). Corporation Counsel contend that the "debriefing" practice violated neither the Constitution nor the Handschu Guidelines, original or modified;[6] that Class Counsel have shown no entitlement to relief; and that the relief requested would only visit upon the NYPD a counterproductive and unjustified form of punishment.

## II. DISCUSSION

In the February Opinion, I had occasion to observe:

> In this American democracy, government is obligated by its compact with the citizens who consent to be governed to preserve for each the freedoms and rights conferred by the Constitution, while at the same time ensuring the safety of all. Tensions between these responsibilities of government, executive and legislative, inevitably arise, as they have in this case.

2003 WL 302258, at *20. The events giving rise to the present motion furnish an-

---

**6.** Both versions of the Guidelines are implicated because the first of the three Iraq war protests occurred on February 15, 2003, prior to the Court's decision and order allowing the modifications.

other example of those tensions, and once again "it falls to the judicial branch to resolve them." *Id.*

The NYPD's successful motion to modify the Handschu Guidelines depended for its factual basis upon the sworn declarations of the officer in charge of intelligence operations, Deputy Commissioner Cohen. The Department's resistance to Class Counsel's present motion depends upon the declaration of a lower ranking officer, Inspector Cutter. Neither Commissioner Kelly nor Deputy Commissioner Cohen have submitted declarations. Knowledge of Commissioner Kelly's views must be gleaned from the newspapers.

Several aspects of Inspector Cutter's declaration are problematic. The first, and most glaring, problem is that officer's description of the questionnaire INTEL officers used while interrogating arrested demonstrators as a "Demonstration *Debriefing* Form" (emphasis added). To put it charitably, "debriefing" is a misnomer. That noun and its root verb have well recognized definitions in current English speech. "Debrief" is defined as "to interrogate (as a pilot returning from a mission or a government official returning from abroad) in order to obtain information or intelligence." *Webster's Third New International Dictionary* (unabridged) (1993) at page 582. "Debriefing" is defined as a "report of a mission or task." *WorldNet* 1.6, copyrighted in 1997 by Princeton University. One need not share the linguistic expertise of a William Safire to perceive that these arrestees were not being "debriefed" as that word is currently used. The demonstrators taken into custody were not pilots returned from a mission or government officials returned from abroad, giving reports to their comrades in arms or bureaucratic superiors in the ordinary course of public service. The arrestees did not want to be in police stations, and

interrogation by INTEL officers was not part of their professional routines. But the phrase for what actually occurred comes readily to mind. These individuals, having been arrested, were in custody while being interrogated by NYPD officers. It necessarily follows that they were subjected to a "custodial interrogation," a procedure with potential constitutional complications familiar to law enforcement officers, prosecutors, and defense counsel, and presumably encountered by Inspector Cutter while he was a student at the Police Academy, if not before. I am not prepared to say that Inspector Cutter's use of the phrase "demonstration debriefing form" was deliberately disingenuous, but it was certainly an odd choice of words.

Moreover, I noted in Part I Inspector Cutter's assertion that the arrested demonstrators "voluntarily made a personal choice about whether to answer questions asked by INTEL officers." Inspector Cutter cannot have personal knowledge on that point; there is no indication that so senior an officer personally participated in these post-arrest interrogations. So he must be relying upon what junior INTEL officers reported to him. But those reports cannot be accepted at face value. As demonstrated in Part I, there is ample reason to believe that at least some INTEL officers asked questions going far afield from the relatively few in the form, despite reports to Inspector Cutter that the officers "asked only the questions contained in the debriefing form." In addition, one arrested demonstrator swore that she was detained in custody for 15 hours so that she could be interviewed by a detective, an extended detention at odds with voluntary answers willingly given. And quite apart from any particular length of detention, the fact that the demonstrators were under arrest at the time is itself a sufficient ground to question the voluntary nature of their answers. During cus-

todial interrogation there is an "inherently compelling pressure[ ] which work[s] to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely," *Pennsylvania v. Muniz*, 496 U.S. 582, 596 n. 10, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990).

At oral argument Corporation Counsel characterized Class Counsel's motion as one "to punish the police department for what plaintiffs' class believes was unconstitutional with respect to these two [*sic*] demonstrations," a belief Corporation Counsel argues Class Counsel could not sustain because, given the demonstrators' illegal conduct for which they were arrested, the questions put to them were for a "law enforcement purpose," Transcript of Argument ("Tr.") at 60–61.

■ While this contention has a surface appeal, a court's orders, judgments and decrees can serve not only to punish conduct, but also to discipline and to deter. These recent events reveal an NYPD in some need of discipline. On the NYPD's own account, neither Commissioner Kelly nor Deputy Commissioner Cohen knew about Inspector Cutter's "debriefing" form; and Inspector Cutter did not know that (as I have found) INTEL officers were exceeding that form's inquisitorial boundaries.[7] Commissioner Kelly told the press that he saw nothing wrong with the debriefing procedure, while at the same time ordering Inspector Cutter to stop doing it and never do it again without Deputy Commissioner Cohen's permission. This has about it the aura of discipline; and one would not be surprised to learn that Inspector Cutter had some words for the INTEL officers whose interrogations roamed far off the reservation (although there is no evidence of this, and the possibility is not a factor in the view I take of the case). Moreover, if these inquisitorial practices were problematic, a modified judgment from this Court might have a salutary deterrent effect.

While the Corporation Counsel poses the question as one of a constitutional violation *vel non*, and constitutional issues were touched upon in the briefs and arguments, I do not think I am required to find that the "debriefing" procedures offended the Constitution to grant the plaintiff class relief on the present motion. On the contrary, there are significant reasons why I should not reach the constitutional question. The Constitution itself, as binding upon this Court as it is upon the NYPD, limits the judicial power of the United States to presently existing "cases" and "controversies," Article III, Section 2; but Class Counsel are not presently asking the Court to declare this NYPD procedure unconstitutional, having preferred initially to place the issue before the Handschu Authority, which is still considering its response. Nor has any individual arrested and interrogated demonstrator asked this Court for a constitutional ruling.[8] Addi-

---

7. Corporation Counsel's contentions focused only upon the relatively few questions appearing on the form. Ms. Donoghue, the able Special Assistant to the Corporation Counsel who argued the case, took some pains to distance herself from the additional questions described in the arrested demonstrators' affidavits; she said: "But those questions were not authorized by the intelligence division. That's not what the officers were told to inquire about. The reason they were given the debriefing form was to focus their questions on the issues that were important to the police department." Tr. 32. Counsel's disclaimer is understandable. It is difficult to discern any legitimate intelligence gathering or law enforcement purpose in some of the questions the INTEL officers asked arrested demonstrators.

8. Lest there be any misunderstanding, I would not regard such an action as sufficiently "related" to the captioned case to remove the case from the usual random procedures

tionally, lower federal courts are routinely instructed to eschew constitutional rulings if the circumstances of the case allow.

██ I conclude that the plaintiff class is entitled to a strengthening of the Judgment because the two-level display of operational ignorance on the part of the NYPD's highest officials with respect to an investigatory technique resonant with constitutional overtones, as revealed by this record, requires that enhancement. While I accept Commissioner Kelly's statement to the press that he and Cohen, the NYPD's Deputy Commissioner of Intelligence, did not know what Inspector Cutter was doing in the name of intelligence, I think it clear that in such a sensitive area and at such a sensitive time (including the pendency of the NYPD's motion to amend the Handschu consent decree) the two commissioners should have known. It is entirely appropriate to hold senior police officials to that common law tort standard of responsibility; in this Court's first *Handschu* opinion, Judge Weinfeld held that the plaintiff class "would be entitled to injunctive relief" if plaintiffs proved "a pattern of unconstitutional conduct, *of which the defendants should have been aware," Handschu v. Special Services Division,* 349 F.Supp. 766, 771 (S.D.N.Y. 1972) (emphasis added).[9] By the same token, accepting the Corporation Counsel's argument that Inspector Cutter did not know what questions his INTEL officers were asking, he should have known.

I do not accept Class Counsel's seeming accusation that the NYPD, while asking this Court to modify the Handschu consent decree and guidelines, was at the same time scheming in bad faith to resurrect the odious Red Squad. The NYPD raised serious issues of public security with which this Court's February Opinion attempted to deal. At that time I regarded the Order and Judgment implementing that Opinion as striking a proper balance between the legitimate demands of public security and individual freedoms. Given the NYPD intelligence-gathering techniques being employed at that same time, as revealed by the present record, I no longer hold that confidence; and that is so, notwithstanding Commissioner Kelly's public assurance (which I accept) that for the present that particular technique is not being utilized.

Having concluded that the plaintiff class is entitled in principle to a further revision of the Order and Judgment, it remains to consider how this should be accomplished in practice. Class Counsel, in a post-argument letter dated June 2, 2003, offer suggestions which seem to me balanced and fair. Class Counsel propose to leave unchanged the "Reservations" paragraph with which the Modified Handschu Guidelines appearing in the NYPD Patrol Guide concludes, but to include in a revised Order and Judgment language to the effect that (to quote counsel's letter) "the last paragraph of the Guidelines shall be read in light of the fact that the Guidelines are incorporated in the Consent Decree, and procedures under the Consent Decree may pursued in case of an alleged violation of the Decree."

This approach gives the plaintiff class an increased protection warranted by recent events without unfairly burdening the NYPD. Retention of the Guidelines' "Reservations" paragraph continues to insulate the NYPD from individual legal actions

---

for assigning cases to the dockets of the Judges of the Court.

**9.** The defendants in the case as it existed before Judge Weinfeld included the Mayor of

the City of New York and Commissioner Kelly's predecessor in office. *See Handschu,* 349 F.Supp. at 767.

based upon perceived failures to follow the Guidelines which do not rise to a constitutional level. Indeed, as with the present order and judgment, no liability on the part of the NYPD under a further revised Order and Judgment and Guidelines will attach unless a constitutional violation does occur; the effect of the revision is to make a violation of the Constitution a contempt of the Court's order as well. That consequence should not unduly trouble the NYPD, which I will assume is not engaged in thinking up ways to violate the Constitution. Moreover, the history of this class action, going back to the entry of the first consent decree in 1985, reflects the parties' understanding that Class Counsel, not individual plaintiffs, would bring any motion to hold the NYPD in contempt.[10]

At oral argument Corporation Counsel expressed a concern that "if all these guidelines are incorporated in the decree, although plaintiffs say they wouldn't be running into court for every little transgression, there is really no protection for the police department with respect to that," with the added deleterious effect that "the Court would then become inextricably intertwined in the day-to-day operations and decision making on the intelligence division." Tr. 64. I think these concerns are exaggerated. Class Counsel have throughout this protracted litigation tempered energetic advocacy with restraint: a behavioral balance that does not come naturally to lawyers. Moreover, the Statement of Policy with which the Modified Guidelines begin, quoted in the margin,[11] makes it clear that any failure of the NYPD to comply with the Guidelines must rise to a constitutional level in order to sustain a motion by Class Counsel to hold the NYPD in contempt.

In summary: while I do not decide, one way or the other, whether the "debriefing" procedure described *supra* violated the constitutional rights of any of the arrested demonstrators, the circumstances surrounding that procedure entitle the plaintiff class, operating through Class Counsel, to an enhanced level of judicial review.[12]

For the foregoing reasons, a revised Order and Judgment consistent with this Opinion will be entered.

### SECOND REVISED ORDER AND JUDGMENT

The Court having entered a Memorandum Opinion and Order dated February

---

10. Thus Mr. Eisenstein stated at the oral argument:

> [O]bviously, the federal rules give everybody the right to try and intervene. But as a matter of the consent decree, class counsel was charged in perpetuity, God help us, with the obligation of monitoring this settlement and monitor it we did, Judge, and monitor it we will.

THE COURT: So here you are.
MR. EISENSTEIN: Here I am.
Tr. 18.

11. "STATEMENT OF POLICY: It is the policy of the New York City Police Department that investigations involving political activity conform to the guarantees of the Constitution, that care be exercised in the conduct of those investigations so as to protect constitutional rights, and that matters investigated be con-

fined to those supported by a legitimate law enforcement purpose."

12. Class Counsel styled the present motion as one under Rule 59(e), Fed.R.Civ.P., to "alter or amend" the August 8, 2003 Order and Judgment. Corporation Counsel contend that the procedural requirements for a motion based upon Rule 59(e) have not been satisfied. I do not agree, but in any event it seems plain that the motion would also properly lie under Rule 60, captioned "Relief from Judgment or Order." Rule 60(b)(3) provides for such relief on the basis of "newly discovered evidence," a concept within which the "debriefing" procedures fit comfortably, and Rule 60(b)(6) allows a motion based upon "any other reason justifying relief from the operation of the judgment." The present motion is timely under either subsection of the Rule.

11, 2003, reported at 2003 U.S. Dist. LEXIS 2134, 2003 WL 302258 (S.D.N.Y.2003), stating that the Handschu Guidelines, which form an integral part of the consent decree previously entered in this case and set forth in an Opinion and Order dated March 7, 1985 and reported at 605 F.Supp. 1384 (S.D.N.Y.1985), would be modified if the New York City Police Department ("NYPD") complied with two numbered conditions set forth in 2003 U.S. Dist. LEXIS 2134 at *63–64, 2003 WL 302258, at *21; and the NYPD having complied with those conditions; and the Court being fully advised in the premises; it is now

ORDERED, ADJUDGED, AND DECREED, that the motion of the NYPD to modify the Handschu Guidelines be, and the same hereby is, granted; and it is further

ORDERED, ADJUDGED, AND DECREED, that the Handschu Guidelines are modified in such a manner as to conform to the text appearing in Appendix "A" of the Court's Memorandum and Order of February 11, 2003; and it is further

ORDERED, ADJUDGED, AND DECREED, that the Guidelines for Investigations Involving Political Activity appearing in Exhibit "A" to the declaration of Deputy Chief Edwin A. Young dated March 20, 2003, remain in the NYPD Patrol Guide unless otherwise directed by the Court; and it is further

ORDERED, ADJUDGED, AND DECREED, that the Guidelines for Investigations Involving Political Activity referred to in the preceding paragraph of this Second Revised Order and Judgment having declared in their Statement of Policy that such investigations are to conform to the guarantees of the Constitution of the United States, and in order to clarify and enhance the standing and authority of counsel for the plaintiff class to contend, if so advised, that violations of the said Guidelines have deprived a member or members of the plaintiff class of rights or freedoms guaranteed to them by the Constitution, the said Guidelines are, to that extent and for that purpose, incorporated by reference into and made a part of this Second Revised Order and Judgment; and it is further

ORDERED, ADJUDGED, AND DECREED, that the Revised Order and Judgment entered on April 4, 2003 be, and the same hereby is, wholly vacated, replaced, and superseded by this Second Revised Order and Judgment.

## APPENDIX A TO SECOND REVISED ORDER AND JUDGMENT

## GUIDELINES FOR INVESTIGATIONS INVOLVING POLITICAL ACTIVITY

### *PREAMBLE*

Subsequent to the terrorist attacks on the City of New York on September 11, 2001 which resulted in the loss of thousands of lives and the total destruction of the World Trade Center complex, it became apparent that the City faces unprecedented threats to its continued safety and security. In the view of federal, state and local law enforcement agencies, the prevention of future attacks requires the development of intelligence and the investigation of potential terrorist activity before a unlawful act occurs.

As a result of a federal court order entered in 1985, the New York City Police Department was bound by guidelines, known as the Handschu Guidelines, which governed the investigation of political activity. The Handschu Guidelines (i) limited the investigation of political activity to those circumstances when there was specific information of criminal activity and (ii)

established the Handschu Authority to oversee compliance.

After evaluating the impact of the Handschu Guidelines on the need to investigate terrorism in a changed world, the City made an application to modify the order so as to eliminate the restrictions contained in the Handschu Guidelines and the oversight of the Handschu Authority with respect to those restrictions. The City did not seek to eliminate the Handschu Authority's role to investigate an individual's complaint that the NYPD had engaged in unconstitutional conduct in the investigation of political activity.

The Court granted the City's application to modify the decree provided the City adopt the internal guidelines set forth below and distribute the guidelines to supervisory personnel who, in turn, were to make them known to those under their command. These guidelines shall remain in effect unless otherwise ordered by the Court.

These guidelines are binding on all members of the service who are engaged in the investigation of political activity. It is the purpose of these guidelines to enable officers to perform their duties with greater certainty, confidence and effectiveness while at the same time protecting the guarantees of the Constitution.

## I. *STATEMENT OF POLICY*

It is the policy of the New York City Police Department that investigations involving political activity conform to the guarantees of the Constitution, that care be exercised in the conduct of those investigations so as to protect constitutional rights, and that matters investigated be confined to those supported by a legitimate law enforcement purpose.

## II. *GENERAL PRINCIPLES*

(1) In its effort to anticipate or prevent unlawful activity, including terrorist acts, the NYPD must, at times, initiate investigations in advance of unlawful conduct. It is important that such investigations not be based solely on activities protected by the First Amendment. When, however, statements advocate unlawful activity, or indicate an apparent intent to engage in unlawful conduct, particularly acts of violence, an investigation under these guidelines may be warranted, unless it is apparent, from the circumstances or the context in which the statements are made, that there is no prospect of harm.

(2) Based upon the circumstances of a given case, investigative action may be required under exigent circumstances. Exigent circumstances are circumstances requiring action before authorization otherwise necessary under these guidelines can reasonably be obtained, in order to protect life or substantial property interests; to apprehend or identify a fleeing offender; to prevent the hiding, destruction or alteration of evidence; or to avoid other serious impairment or hindrance of an investigation. When any investigative action, taken under exigent circumstances, would require an approval under ordinary conditions, such approval shall be obtained as soon as practicable in accordance with the provisions of these guidelines. Where a regular approval or request is required to be in writing, the approval or request following exigent circumstances shall also be in writing.

(3) Investigations shall be terminated when all logical leads have been exhausted and no legitimate law enforcement purpose justifies their continuance.

## III. *APPLICABILITY*

These guidelines apply only to investigations which involve political activity. They

do not apply to, or limit, other activities of the NYPD in the investigation or detection of unlawful conduct, the preservation of the peace and public safety or other legitimate law enforcement activities which do not involve political activity.

## IV. ROLE OF THE INTELLIGENCE DIVISION

(1) Investigation of political activity shall be initiated by, and conducted under the supervision of the Intelligence Division. Nothing in this paragraph, however, is intended to prevent any member of the service from reporting his or her observations of suspicious conduct which involves political activity to his or her commanding officer or to the Intelligence Division.

(2) The Deputy Commissioner of Intelligence shall periodically inform and advise the Police Commissioner concerning the status of any investigations conducted pursuant to these guidelines.

## V. LEVELS OF INVESTIGATION

These guidelines provide for three levels of investigative activity. They are intended to provide the NYPD with the necessary flexibility to act well in advance of the commission of planned terrorist acts or other unlawful activity. However, if the available information shows at the outset that the threshold standard for a preliminary inquiry or full investigation is satisfied, then the appropriate investigative activity may be initiated immediately, without progressing through more limited investigative stages.

## A. CHECKING OF LEADS

The lowest level of investigative activity is the "prompt and extremely limited checking out of initial leads," which should be undertaken whenever information is received of such a nature that some follow-up as to the possibility of unlawful activity is

warranted. This limited activity should be conducted with an eye toward promptly determining whether further investigation (either a preliminary inquiry or a full investigation) should be conducted.

## B. PRELIMINARY INQUIRIES

(1) In cases where the NYPD receives information or an allegation not warranting an investigation—because there is not yet a "reasonable indication" of unlawful activity—but whose responsible handling requires some further scrutiny beyond the prompt and extremely limited checking out of initial leads, the NYPD may initiate an "inquiry" in response to the allegation or information indicating the possibility of unlawful activity. Whether it is appropriate to open a preliminary inquiry immediately, or instead to engage first in a limited checking out of leads, depends on the circumstances presented.

*Example:* If the NYPD receives an allegation that an individual or group has advocated the commission of violence, and no other facts are available, an appropriate first step would be checking out of leads to determine whether the individual, group, or members of the audience have the apparent ability or intent to carry out the advocated unlawful act.

(2) The authority to conduct inquiries short of a investigation allows the NYPD to respond in a measured way to ambiguous or incomplete information, with as little intrusion as the needs of the situation permit. This is especially important in such areas as where there is no complainant involved or when an allegation or information is received from a source of unknown reliability. Such inquiries are subject to the limitations on duration under paragraph (4) below and are carried out to obtain the information necessary to

make an informed judgment as to whether a full investigation is warranted.

*Example:* Officers are not required to possess information relating to an individual's intended unlawful use of dangerous biological agents or toxins prior to initiating investigative activity. If an individual or group has attempted to obtain such materials, or has indicated a desire to acquire them, and the reason is not apparent, investigative action, such as conducting a checking out of leads or initiating a preliminary inquiry, may be appropriate to determine whether there is a legitimate purpose for the possession of the materials by the individual or group.

A preliminary inquiry is not a required step when facts or circumstances reasonably indicating unlawful activity are already available. In such cases, a full investigation can be immediately opened.

(3) A preliminary inquiry may be authorized by the Commanding Officer or Executive Officer of the Intelligence Division or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials"). The Authorizing Official must assure that the allegation or other information which warranted the inquiry has been recorded in writing. Upon such authorization a notification must be made for final approval by the Deputy Commissioner of Intelligence.

(4) Inquiries shall be completed within 180 days after initiation of the first investigative step. The date of the first investigative step is not necessarily the same date on which the first incoming information or allegation was received. An extension of time in an inquiry for succeeding 90 day periods may be granted by the Deputy Commissioner of Intelligence. Any such request for extension shall be in writing and shall include a statement of the reasons why further investigative steps are warranted when there is no reasonable indication of unlawful activity. The action taken on any such request for extension shall also be recorded in writing.

(5) All lawful investigative techniques, including the use of undercover operations and the development of sources and informants may be used in an inquiry except:

(a) Mail openings; and

(b) Eavesdropping and Video Surveillance as those terms are defined in Article 700 of the New York State Criminal Procedure Law.

(6) The following investigative techniques may be used in an inquiry without any prior authorization from a supervisor:

(a) Examination of NYPD indices and files;

(b) Examination of records available to the public and other public sources of information;

(c) Examination of available federal, state and local government records;

(d) Interview of complainant, previously established informants, and other sources of information;

(e) Interview of the potential subject;

(f) Interview of persons who should readily be able to corroborate or deny the truth of the allegation, except this does not include pretext interviews or interviews of a potential subject's employer or coworkers unless the interviewee was the complainant; and

(g) Physical, photographic or video surveillance of any person, provided that such surveillance does not require a warrant.

The use of any other lawful investigative technique that is permitted in an inquiry shall meet the requirements and limitations of Part VI and, except in exigent circumstances, requires prior approval by a supervisor.

(7) Where a preliminary inquiry fails to disclose sufficient information to justify an investigation, the NYPD shall terminate the inquiry and make a record of the closing.

(8) All requirements regarding inquiries shall apply to reopened inquiries.

## C. INVESTIGATION

A full investigation may be initiated when facts or circumstances reasonably indicate that unlawful act has been, is being, or will be committed. A full investigation may be conducted to prevent, solve or prosecute such unlawful activity.

(1) The standard of "reasonable indication" is substantially lower than probable cause. In determining whether there is reasonable indication of an unlawful act an investigator may take into account any facts or circumstances that a prudent investigator would consider. However, the standard does require specific facts or circumstances indicating a past, current, or future violation. There must be an objective, factual basis for initiating the investigation; a mere hunch is insufficient.

(2) Where a unlawful act may be committed in the future, preparation for that act can be a current violation of the conspiracy or attempt provisions of state law. The standard for opening an investigation is satisfied where there is not yet a current substantive or preparatory unlawful act, but facts or circumstances reasonably indicate that such unlawful conduct will occur in the future.

(3) Any lawful investigative technique may be used in a full investigation, subject to the requirements and limitations of Part VI hereof.

(4) Authorization and Renewal

a. A full investigation may be authorized by the Commanding Officer or Executive Officer of the Intelligence Division or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials") upon a written recommendation setting forth the facts or circumstances reasonably indicating that an unlawful act has been, is being or will be committed. Upon such authorization a notification must be made for final approval by the Deputy Commissioner of Intelligence. When exigent circumstances exist, as described in Section V(B)(6) of these guidelines, a full investigation may be commenced upon the verbal authorization of an Authorizing Official. However, in such cases, the required written recommendation must be submitted as soon as practicable.

b. A full investigation may be initially authorized for a period of up to a year. An investigation may be continued upon renewed authorization for additional periods each not to exceed a year. Renewal authorization shall be obtained from the Deputy Commissioner of Intelligence. All requests for renewal authorization, and action thereon, shall be in writing.

c. Authorizations shall be reviewed by an Authorizing Official before the expiration of the period for which the investigation and each renewal thereof is authorized.

(5) An investigation which has been terminated may be reopened upon a showing of the same standard and pursuant to the same procedures as required for initiation of an investigation. All requirements regarding investigations shall apply to reopened investigations.

## D. TERRORISM ENTERPRISE INVESTIGATION

A terrorism enterprise investigation is a full investigation but differs from a general investigation of unlawful conduct in several

important respects. As a general rule, an investigation of a completed unlawful act is normally confined to determining who committed that act and securing evidence to establish the elements of the particular offense. It is, in this respect, self-defining. A terrorism enterprise investigation must determine the identity and nature of the individual, group, or organization involved, its geographic dimensions, its past acts and intended goals, including unlawful goals, and its capacity for harm, among other factors. While a standard investigation of unlawful conduct terminates with the decision to prosecute or not to prosecute, a terrorism enterprise investigation does not necessarily end, even though one or more of the participants may have been prosecuted.

In addition, groups and organizations provide a life and continuity of operation not normally found in other types of unlawful activity. As a consequence, these investigations may continue for several years. Furthermore, the focus of such investigations may be less precise than that directed against more conventional types of unlawful conduct. Unlike the usual case involving unlawful conduct, there may be no completed offense to provide a framework for the investigation. It often requires the fitting together of bits and pieces of information, many meaningless by themselves, to determine whether a pattern of unlawful activity exists. For this reason, such investigations are broader and less discriminate than usual, involving the interrelation of various sources and types of information.

This section focuses on investigations of enterprises that seek to further political or social goals through activities that involve force or violence, or that otherwise aim to engage in terrorism or terrorism-related crimes. It authorizes investigations to determine the structure and scope of the enterprise as well as the relationship of the members.

### 1. General Authority

a. A terrorism enterprise investigation may be initiated when facts or circumstances reasonably indicate that two or more persons are engaged in an enterprise for the purpose of (i) furthering political or social goals wholly or in part through activities that involve force, violence or other unlawful acts; (ii) engaging in terrorism as defined in N.Y. Penal Law § 490.05, or (iii) committing any offense described in N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, or 490.35, or other related statutes currently in effect or subsequently enacted. The standard of "reasonable indication" is identical to that governing full investigations generally. In determining whether an investigation should be conducted, the NYPD shall consider all of the circumstances including: (i) the magnitude of the threatened harm; (ii) the likelihood that it will occur; (iii) the immediacy of the threat; and (iv) any danger to privacy or free expression posed by an investigation. In practical terms, the "reasonable indication" standard for opening a terrorism enterprise investigation could be satisfied in a number of ways.

*Example:* Direct information about statements made in furtherance of an enterprise's objectives which show a purpose of committing crimes described in N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, 490.35 or other related statutes currently in effect or subsequently enacted, would satisfy the threshold.

*Example:* Activities such as attempting to obtain dangerous biological agents, toxic chemicals, or nuclear materials, or stockpiling explosives or weapons, with no discernible lawful purpose, may be sufficient to reasonably indicate that an enterprise aims to engage in terrorism.

b. While no particular factor or combination of factors is required, considerations that will generally be relevant to the determination whether the threshold standard for a terrorism enterprise investigation is satisfied include, as noted, a group's statements, its activities, and the nature of potential unlawful acts suggested by the statements or activities. Thus, where there are grounds for inquiry concerning a group, it may be helpful to gather information about these matters, and then to consider whether these factors, either individually or in combination, reasonably indicate that the group is pursuing terrorist activities or objectives as defined in the threshold standard. Findings that would weigh in favor of such a conclusion include, for example, the following:

(1) *Threats or advocacy of violence or other covered unlawful acts.* Statements are made in relation to or in furtherance of an enterprise's political or social objectives that threaten or advocate the use of force or violence, or statements are made in furtherance of an enterprise that otherwise threaten or advocate unlawful conduct within the scope of N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, 490.35, or other related statutes currently in effect or subsequently enacted which may concern such matters as (e.g.):

(i) engaging in attacks involving or threatening massive loss of life or injury, mass destruction, or endangerment of the national security;

(ii) killing or injuring public officials, or destroying public facilities, or defying lawful authority;

(iii) killing, injuring or intimidating individuals because of their status as United States nationals or persons, or because of their national origin, race, color, religion or sex; or

(iv) depriving individuals of any rights secured by the Constitution or laws of the United States or the State of New York.

(2) *Apparent ability or intent to carry out violence or other covered activities.* The enterprise manifests an apparent ability or intent to carry out violence or other activities within the scope of N.Y. Penal Law §§ 490.10, 490.15, 490.20, 490.25, 490.30, 490.35 or other related statutes currently in effect or subsequently enacted, *e.g.:*

(i) by acquiring or taking steps towards acquiring, biological agents or toxins, toxic chemicals or their precursors, radiological or nuclear materials, explosives or other destructive or dangerous material (or plans or formulas for such materials), or weapons, under circumstances where, by reason of the quantity or character of the items, the lawful purpose of the acquisition is not apparent;

(ii) by the creation, maintenance, or support of an armed paramilitary organization;

(iii) by paramilitary training; or

(iv) by other conduct demonstrating an apparent ability or intent to injure or intimidate individuals, or to interfere with the exercise of their constitutional or statutory rights.

(3) *Potential Unlawful Act.* The group's statements or activities suggest potential unlawful acts that may be relevant in applying the standard for initiating a terrorism enterprise investigation—such as crimes under the provisions of the N.Y. Penal Law that set forth specially defined terrorism or support of terrorism offenses, or that relate to such matters as aircraft hijacking or destruction, attacks on transportation, communications, or energy facilities or systems, biological or chemical weapons, nuclear or radiological materials, assassinations or other violence against public officials or facilities, or explosives.

c. Mere speculation that force or violence might occur during the course of an otherwise peaceable demonstration is not sufficient grounds for initiation of an investigation under this Subpart. But where facts or circumstances reasonably indicate that an individual or group has engaged or aims to engage in conduct described in paragraph 1.a. above in a demonstration, an investigation may be initiated in conformity with the standards of that paragraph. This does not limit the collection of information about public demonstrations by individuals or groups that are under active investigation pursuant to paragraph 1.a. above or any other provisions of these guidelines.

### 2. Purpose

The immediate purpose of a terrorism enterprise investigation is to obtain information concerning the nature and structure of the enterprise as specifically delineated in paragraph (3) below, with a view to the longer range objectives of detection, prevention, and prosecution of the unlawful activities of the enterprise.

### 3. Scope

a. A terrorism enterprise investigation initiated under these guidelines may collect such information as:

(i) the identity and nature of an individual or group and its members, their associates, and other persons likely to be acting in furtherance of its unlawful objectives, provided that the information concerns such persons' activities on behalf of or in furtherance of the suspected unlawful activity of the individual, group, or organization;

(ii) the finances of the individual, group, or organization;

(iii) the geographical dimensions of the individual, group, or organization; and

(iv) past and future activities and goals of the individual, group, or organization.

b. In obtaining the foregoing information, any lawful investigative technique may be used in accordance with the requirements of these guidelines.

### 4. Authorization and Renewal

a. A terrorism enterprise investigation may be authorized by the Commanding Officer or Executive Officer of the Intelligence Division or the Commanding Officer of the Criminal Intelligence Section ("the Authorizing Officials"), upon a written recommendation setting forth the facts or circumstances reasonably indicating the existence of an enterprise as described in paragraph 1.a. above. Upon such authorization a notification must be made for final approval by the Deputy Commissioner of Intelligence. When exigent circumstances exist, as described in these guidelines, a terrorism enterprise investigation may be commenced upon the verbal authorization of an Authorizing Official. However, in such cases, the required written recommendation must be submitted as soon as practicable.

b. A terrorism enterprise investigation may be initially authorized for a period of up to a year. An investigation may be continued upon renewed authorization for additional periods each not to exceed a year. Renewal authorization shall be obtained from the Deputy Commissioner of Intelligence. The request for renewal and action thereon shall be in writing.

c. Authorizations shall be reviewed by an Authorizing Official before the expiration of the period for which the investigation and each renewal thereof is authorized. In some cases, the enterprise may meet the threshold standard but be temporarily inactive in the sense that it has not engaged in recent acts of violence or other unlawful activities as described in 1.a., nor

is there any immediate threat of harm—yet the composition, goals and prior history of the group suggest the need for continuing law enforcement interest. The investigation may be continued in such cases with whatever scope is warranted in light of these considerations.

d. An investigation which has been terminated may be reopened upon a showing of the same standard and pursuant to the same procedures as required for initiation of an investigation.

## VI. INVESTIGATIVE TECHNIQUES

(1) When conducting investigations under these guidelines, the NYPD may use any lawful investigative technique permitted by these guidelines. The choice of investigative techniques is a matter of judgment, which should take account of:

(i) the objectives of the investigation and available investigative resources;

(ii) the intrusiveness of a technique, considering such factors as the effect on the privacy of individuals and potential damage to reputation;

(iii) the seriousness of the unlawful act; and

(iv) the strength of the information indicating its existence or future commission of the unlawful act.

(2) Where the conduct of an investigation presents a choice between the use of more or less intrusive methods, the NYPD should consider whether the information could be obtained in a timely and effective way by the less intrusive means. The NYPD should not hesitate to use any lawful techniques consistent with these guidelines in an investigation, even if intrusive, where the intrusiveness is warranted in light of the seriousness of the crime or the strength of the information indicating its existence or future commission. This

point is to be particularly observed in investigations relating to terrorist activities.

(3) Authorized methods in investigations include, among others, use of confidential informants, undercover activities and operations, eavesdropping and video surveillance (as defined in Article 700 of the N.Y. Criminal Procedure Law), pen registers and trap and trace devices, consensual electronic monitoring, and searches and seizures.

### a. Undercover Operations

(i) Undercover operations, including confidential informants, may be used when such operations are the most effective means of obtaining information, taking into account all the circumstances of the investigation, including the need for the information and the seriousness of the threat. The use of undercovers and confidential informants must be authorized by the Deputy Commissioner of the Intelligence Division prior to commencement of the undercover operation. The request to use undercovers or confidential informants and action taken on the request must be in writing and must include a description of the facts on which the investigation is based and the role of the undercover.

(ii) The use of an undercover or confidential informant will be approved for a period of 120 days and may be extended for additional periods of 120 days with the approval of the Deputy Commissioner of the Intelligence Division. Such extensions may be approved for as long as the investigation continues and the use of the undercover is the most effective means of obtaining information. The request to extend the use of undercovers and action taken on the request must be in writing and must include the reason for the extension.

(iii) Undercovers are strictly prohibited from engaging in any conduct the sole purpose of which is to disrupt the lawful exercise of political activity, from instigating unlawful acts or engaging in unlawful or unauthorized investigative activities.

b. Eavesdropping and Video Surveillance (as defined in Article 700 of the N.Y. Criminal Procedure Law), Pen Registers and Trap and Trace Devices, and Consensual Electronic Monitoring—All requirements for the use of such methods under the Constitution, applicable statutes, and NYPD regulations or policies must be observed.

(4) Whenever an individual is known to be represented by counsel in a particular matter, the NYPD shall follow applicable law and Department procedure concerning contact with represented individuals in the absence of prior notice to their counsel.

## VII. DISSEMINATION AND MAINTENANCE OF INFORMATION

A. The NYPD may disseminate information obtained during the checking of leads, preliminary inquiries and investigations conducted pursuant to these guidelines to federal, state or local law enforcement agencies, or local criminal justice agencies when such information:

(i) falls within the investigative or protective jurisdiction or litigative responsibility of the agency;

(ii) may assist in preventing an unlawful act or the use of violence or any other conduct dangerous to human life;

(iii) is required to be disseminated by interagency agreement, statute, or other law.

B. All documentation required under these Guidelines shall be maintained by the Intelligence Division in accordance with general police department practice and applicable municipal record retention and destruction rules, regulations and procedures. Under these rules and practices documents are retained for no less than five years.

## VIII. COUNTERTERRORISM ACTIVITIES AND OTHER AUTHORIZATIONS

In order to carry out its mission of preventing the commission of terrorist acts in or affecting the City of New York and the United States and its people, the NYPD must proactively draw on available sources of information to identify terrorist threats and activities. It cannot be content to wait for leads to come in through the actions of others, but rather must be vigilant in detecting terrorist activities to the full extent permitted by law, with an eye towards early intervention and prevention of acts of terrorism before they occur. This Part accordingly identifies a number of authorized activities which further this end, and which can be carried out even in the absence of a checking of leads, preliminary inquiry, or full investigation as described in these guidelines. The authorizations include both activities that are specifically focused on terrorism and activities that are useful for law enforcement purposes in both terrorism and non-terrorism contexts. The authorized law enforcement activities of the NYPD include carrying out and retaining information resulting from the following activities.

## A. COUNTERTERRORISM ACTIVITIES

### 1. Information Systems

The NYPD is authorized to operate and participate in identification, tracking, and information systems for the purpose of identifying and locating potential terrorists

and supporters of terrorist activity, assessing and responding to terrorist risks and threats, or otherwise detecting, prosecuting, or preventing terrorist activities. Systems within the scope of this paragraph may draw on and retain pertinent information from any source permitted by law, including information derived from past or ongoing investigative activities; other information collected or provided by governmental entities, such as foreign intelligence information and lookout list information; publicly available information, whether obtained directly or through services or resources (whether nonprofit or commercial) that compile or analyze such information; and information voluntarily provided by private entities. Any such system operated by the NYPD shall be reviewed periodically for compliance with all applicable statutory provisions and Department regulations and policies.

## 2. Visiting Public Places and Events

For the purpose of detecting or preventing terrorist activities, the NYPD is authorized to visit any place and attend any event that is open to the public, on the same terms and conditions as members of the public generally. No information obtained from such visits shall be retained unless it relates to potential unlawful or terrorist activity.

## B. OTHER AUTHORIZATIONS

### 1. General Topical Research

The NYPD is authorized to carry out general topical research, including conducting online searches and accessing online sites and forums as part of such research on the same terms and conditions as members of the public generally. "General topical research" under this paragraph means research concerning subject areas that are relevant for the purpose of facilitating or supporting the discharge of investigative responsibilities. It does not include online searches for information by individuals' names or other individual identifiers, except where such searches are incidental to topical research, such as searching to locate writings on a topic by searching under the names of authors who write on the topic, or searching by the name of a party to a case in conducting legal research.

### 2. Use of Online Resources Generally

For the purpose of developing intelligence information to detect or prevent terrorism or other unlawful activities, the NYPD is authorized to conduct online search activity and to access online sites and forums on the same terms and conditions as members of the public generally.

### 3. Reports and Assessments

The NYPD is authorized to prepare general reports and assessments concerning terrorism or other unlawful activities for purposes of strategic or operational planning or in support of other legitimate law enforcement activities.

## IX. PROTECTION OF PRIVACY AND OTHER LIMITATIONS

### A. General Limitations

The law enforcement activities authorized by this Part do not include maintaining files on individuals solely for the purpose of monitoring activities protected by the First Amendment or the lawful exercise of any other rights secured by the Constitution or laws of the United States. Rather, all such law enforcement activities must have a valid law enforcement purpose and must be carried out in conformity with all applicable statutes and Department regulations and policies.

## B. Construction of Part

This Part does not limit any activities authorized by or carried out under other Parts of these guidelines. The specification of authorized law enforcement activities under this Part is not exhaustive, and does not limit other authorized law enforcement activities of the NYPD.

## X. *RESERVATION*

Nothing in these guidelines shall limit the general reviews or audits of papers, files, contracts, or other records in the possession of the NYPD or City of New York, or the performance of similar services at the specific request of another government agency. Such reviews, audits, or similar services must be for the purpose of detecting or preventing violations of law which are within the investigative responsibility of the NYPD.

Nothing in these guidelines is intended to limit the NYPD's responsibilities to investigate certain applicants and employees, or to pursue efforts to satisfy any other of its legal rights, privileges, or obligations.

These guidelines are set forth solely for the purpose of internal NYPD guidance. They are not intended to, do not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter, civil or criminal, nor do they place any limitation on otherwise lawful investigative and litigative prerogatives of the NYPD or City of New York.